1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**

9

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

10
11

CURTIS LEE HENDERSON, SR.,

No.  2:18-CV-2181-JAM-DMC-P

12

Plaintiff,

13

v.

<u>FINDINGS AND RECOMMENDATIONS</u>

14

JOE LIZARRAGA, et al.,

15

Defendants.

16
17

Plaintiff, a prisoner proceeding pro se, brings this civil rights action under 42 U.S.C.

18

§ 1983. Before the Court is Defendant's motion for summary judgment. ECF No. 56.

19

Plaintiff filed an opposition on February 2, 2021. ECF No. 105. The opposition was due January

20

19, 2021 and is untimely. <u>See</u> ECF No. 103. Nevertheless, given Plaintiff's status as a pro se

21

prisoner and delays attributable to the COVID-19 pandemic, the Court will consider the opposition.

22

Defendant has not replied to Plaintiff's opposition as permitted under Local Rule 230(l). The

23

undersigned United States Magistrate Judge recommends granting summary judgment in part and

24

denying it in part.

25

///

26

///

27

///

28

///

# I. PLAINTIFF'S ALLEGATIONS

Plaintiff is a California state prisoner. ECF No. 20. He makes several claims alleging unconstitutional treatment during his incarceration. See id. Namely, he brings the following basic claims: deliberate indifference to medical needs in violation the Eighth Amendment by Defendants Wong, Jackson, Smith, Ramirez, and Perez; retaliation in violation of the First Amendment by Defendants Moua, Ancheta, Thorpe, Clevenger, Lizarraga, and Stacy; and failure to protect in violation of the Eighth Amendment by Defendants Lizarraga, Stacy, Clevenger, Ancheta, and Moua. See id. The factual allegations are numerous, so the Court lays them out in some detail.

## A. Plaintiff's Eighth Amendment Claims:

Plaintiff first contends that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment to the United States Constitution. Id. at 5.

Plaintiff alleges that he underwent surgery on his right facial zygomatic bone. Id. Defendant Dr. Sam Wong, a physician at Mule Creek State Prison (MCSP), prescribed Elavil to treat Plaintiff's resulting chronic pain. Id. Elavil is an antidepressant. Id. Plaintiff argues that prescription of Elavil violated the Eighth Amendment[1] because Plaintiff was unaware that it was an antidepressant with possible side effects. Id. Elavil, according to Plaintiff, caused problems with his bowels, body temperature, and ability to urinate. Id. It also allegedly gave Plaintiff seizures. Id.

Plaintiff contends that, as consequence of Elavil's side effects, he developed a bladder infection that spread to his left testicle. Id. His testicle swelled in size and caused him significant pain. Id. Dr. Wong saw Plaintiff but only told him that the swelling would subside. Id. Dr. Wong's failure to take further action, in Plaintiff's view, violated the Eighth Amendment. Id. Dr. Wong allegedly knew of and failed to attend to Plaintiff's need of immediate care. Id.

Around February 2015, Plaintiff's testicle pain continued to increase until he could not walk. Id. at 6. A Nurse DeCoito apparently examined Plaintiff in the prison's medical unit but did not notify a doctor. Id. Plaintiff filled out a request for medical treatment and left the medical wing. Id. Plaintiff then pulled his groin and collapsed in pain. Id. A correctional officer activated

---

[1] Plaintiff also contends, under his Eighth Amendment claim, that Dr. Wong also violated California Government Code section 845.6, which renders public employees liable for knowing failure to provide reasonable medical care to a prisoner in need of immediate medical care. Cal. Govt. Code § 845.6

his medical emergency alarm, but Nurse DeCoito told Defendant Sergeant Ramirez (who was apparently present) that nothing was wrong with Plaintiff. Id. A different correctional officer, Defendant Perez, sat on the ground drinking coffee and mocked Plaintiff. Id. Ramirez and Perez locked Plaintiff in a holding cell. Id. Sergeant Ramirez told Plaintiff nothing would be done for him. Id. Plaintiff argues that DeCoito, Ramirez, and Perez violated the Eighth Amendment.[2] Id.

Plaintiff asserts that he was left in significant pain for over eight months due to the swelling and infection in his testicle. Id. at 7. His testicle, consequently, had to be removed. Id. Medical staff apparently sent Plaintiff to San Joaquin General Hospital for the surgery. Id. When he returned to MCSP on Friday, September 4, 2015, no medical staff tended to him after surgery. Id. Four days went by without medical staff observing Plaintiff or changing his bandage, and he developed an infection where his testicle had been removed. Id.

Defendants—Plaintiff does not specify whom—continued to prescribe psychiatric medication for pain management. Id. Medical staff allegedly prescribed Cymbalta. Id. Plaintiff contends that the prescription of psychiatric medication for pain is unconstitutional. Id.

A few days after Plaintiff returned from surgery, September 9, 2015, the surgical site bled and drained yellow fluid. Id. at 8. Staff took Plaintiff to the prison hospital. Id. He argues that the resulting risk to his remaining testicle, when he had already had one removed, thus reducing his ability to procreate, was unconstitutional. Id. Plaintiff complains that he continued to suffer from pain in his groin. Id. Sometime later—Plaintiff states on or about September 27, 2016[3]—he continued to suffer from infection, and had developed scar tissue in his urethra and pain in his kidneys. Id. Medical staff attended to Plaintiff in the prison's triage unit. Id. A prison physician, Dr. Rudas, drained an abscess on Plaintiff's scrotum. Id. Plaintiff alleges that Dr. Wong, over the course of the above events, knew of Plaintiff's enduring pain and infection, and violated the Eighth Amendment in failing to provide Plaintiff with adequate medical care. Id.

---

[2] DeCoito is not a named defendant. See ECF No. 20. Yet, Plaintiffs also contends that the DeCoito, Ramirez, and Perez violated California's civil code, which provides a cause of action for the interference with federal constitutional rights. Id. at 7 (citing Cal. Civ. Code § 52.1). He argues DeCoito coerced Defendants Ramirez and Perez into believing nothing was wrong with Plaintiff, which led to his confinement in a holding cell. Id.

[3] The Court does not know whether Plaintiff means September 27, 2015 or intends to imply nearly a year passed. See ECF No. 20 at 8.

Over a year later, about December 18, 2017, Plaintiff informed a Dr. Aikens (apparently a urologist) that he had informed Defendant Dr. James Jackson of urinary difficulties after Plaintiff's testicle was removed. Id. at 8–9. Dr. Aikens recommended a Prostate Specific Antigen (PSA) test, an ultrasound, and a biopsy. Id. at 9. A few weeks later, on January 8, 2018, Plaintiff then saw Dr. Jackson, explaining that he was in severe pain around his left kidney and was having trouble urinating. Id. Dr. Jackson denied Plaintiff's request for a CT scan and for transportation to Dr. Aikens, allegedly telling Plaintiff that it would be too expensive. Id Plaintiff contends that Dr. Jackson was deliberately indifferent to Plaintiff's serious medical needs in his refusal to send Plaintiff to Dr. Aikens or order a scan. Id. Plaintiff complained about Dr. Jackson's provisional medical care. Id. Dr. Smith, MCSP's chief physician, allegedly unconstitutionally "ratified" Dr. Jackson's decisions that led to Plaintiff losing his testicle. See id. at 9, 23.

Plaintiff's condition purportedly deteriorated over the next week. Id. Plaintiff could not urinate or produce semen. Id. at 9. Plaintiff woke up on January 16, 2018, with a fever, chills, vomiting, and headache. Id. at 9–10. He allegedly blacked out and was ultimately sent to an outside hospital. Id. at 10. At the hospital, staff gave Plaintiff two CT scans. Id. The scans indicated sepsis in Plaintiff's left kidney. Id. A urine culture tested positive for E. Coli virus. Id. Hospital physicians admitted Plaintiff to the hospital. Id. A doctor apparently told Plaintiff that Plaintiff's right kidney was being overworked, creating a risk that his kidneys would fail. Id.

Plaintiff argues that the above Defendants' alleged failure to provide adequate treatment establishes deliberate indifference to his serious medical needs. See id. at 10–11.

**B. Plaintiff's Retaliation Claims:**

Plaintiff complains that, on February 4, 2018, he informed Defendant correctional officer T. Moua that Plaintiff's continued work assignment to the kitchen and loading docks was exposing Plaintiff to E. Coli bacteria. Id. at 11. The kitchen and back docks were allegedly consistently wet. Id. Plaintiff told Moua that he would be filing a complaint. Id. at 11, 18. Plaintiff contends that Moua then threatened him. Id. at 11, 18. Moua told Plaintiff that if Plaintiff complained, Moua would issue a rules violation report stating that Plaintiff misused prison food. Id. at 11. Plaintiff contends that Moua retaliated against Plaintiff for engaging in protected conduct.

1   Id. Moua apparently did write Plaintiff up. Id. Plaintiff argues that documentation supports his

2   retaliation claim. Id. He avers that Moua's report, which indicated Plaintiff committed a violation

3   on February 5, 2018, is false because February 5, 2018, was Plaintiff's day off. Id. at 12.

4   Plaintiff then spoke to Defendant Thorpe, an instructor in the prison's C-Facility

5   Office Services and Related Technology (C-OSRT) program. Id. Plaintiff submitted a job

6   application, which Thorpe denied. Id. Thorpe told Plaintiff, who is African American, that he

7   belonged in the kitchen and that white inmates would get into the C-OSRT program. Id. Plaintiff

8   told Thorpe that he was filing a complaint. Id. Thorpe then retaliated against Plaintiff by submitting

9   documentation falsely indicating Plaintiff was fired from his kitchen job for stealing food. Id.

10   Plaintiff filed a complaint against Thorpe with higher authorities; namely,

11   Defendants C. Clevenger and the prison Warden Joe Lizarraga. Id. at 13. Clevenger and Lizarraga

12   denied Plaintiff's complaint even though Thorpe's allegations are false. Id. Plaintiff argues that

13   Clevenger and Lizarraga are thus liable in their supervisory capacities. Id.; see id. at 21–23.

14   In a follow-up interview, Clevenger disregarded Plaintiff's reports that Moua's and

15   Thorpe's accusations were false. Id. at 13. Clevenger directed Defendant Sergeant K. Ancheta to

16   find Plaintiff guilty of the rule violation. Id. 13–14. Ancheta allegedly ignored Plaintiff's

17   explanation that Plaintiff could not have stolen food on February 5, 2018, because he was in the

18   hospital, as proven by a signed copay. Id. at 14. Plaintiff asserts that Ancheta told Plaintiff that he

19   did not care about the evidence. Id. Plaintiff threatened to file a complaint. Id. Ancheta responded

20   that if Plaintiff filed a complaint, he would make Plaintiff's life unpleasant. Id. at 14, 19.

21   Ancheta then imposed a harsh punishment on Plaintiff as retaliation Id. at 14.

22   Ancheta allegedly revoked Plaintiff's canteen privileges for a month. See id. at 19. Soon thereafter,

23   Plaintiff attempted to remedy the situation by speaking to a correctional officer, Captain Pedersen.

24   Id. at 14. Pedersen stated that there was nothing he could personally do but set up another interview

25   for Plaintiff with Defendant Captain Stacy. Id. Plaintiff contends Stacy did nothing, telling Plaintiff

26   that he did not care because he was going on vacation. Id. at 15.

27   Plaintiff contends that Defendants' above actions violated the First Amendment

28   because they retaliated against him for engaging in protected conduct. Id. at 11, 18–20

5

### C.  Plaintiff's Failure to Protect Claims:

Plaintiff asserts that, after he filed this action, Defendants told other inmates that Plaintiff was a snitch. Id. at 24. Fellow inmates consequently called Plaintiff a snitch and beat him. Id. at 24–27. Plaintiff contends that Defendants Lizarraga, Stacy, Clevenger, Ancheta, and Moua are all responsible for failing to protect him from violence from other inmates. Id. at 26. Their leaking of confidential information, moreover, precipitated the violence. Id. Plaintiff contends that Defendants' failure to protect him violated the Eighth Amendment. Id. at 27–31.

### D.  Plaintiff's Claims of Supervisory Liability:

Of note, Plaintiff expands on his above claims that Defendants Lizarraga, Stacy, Clevenger, and Smith are liable for some of the above violations (e.g., Moua's false report). He argues that they are liable under Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978). Id. at 21–23. For example, although the prison is under order not to water down concrete surfaces, Defendants ignored the order. Id. at 21. Guards continued to spray down Plaintiff's work area, leading to Plaintiff's exposure to E. Coli bacteria. Id. Defendant Smith allegedly adopted a custom of cost-cutting, which allowed physicians to forgo provision of treatment to avoid expense. Id. Plaintiff argues that Dr. Smith's policy resulted in his infection. Id.

### II. THE PARTIES' EVIDENCE

### E.  Plaintiff's Noncompliance with Local Rule 260(b):

Local Rule 260 requires motions for summary judgment to include a separate Statement of Undisputed Facts. L.R. 260(a). Each Statement must enumerate each specific, material fact relied upon in the motion and cite to any document—e.g., a deposition—establishing that fact. Id. Parties opposing motions for summary judgment must reproduce the facts in the moving party's Statement of Undisputed Facts and admit the facts that are undisputed and deny those that are disputed. See L.R. 260(b). The opposing party must include with each denial a citation to any document supporting the denial. Id. Opposing parties may also include concise Statements of Disputed Facts encompassing all material facts over which there is a genuine dispute. Id.

///

///

Defendants properly included a Statement of Undisputed Facts alongside his motion for summary judgment. ECF No. 56-3. Plaintiff, however, failed to properly reproduce Defendant's Statement of Undisputed Facts admitting facts that are undisputed and denying those that he contends are disputed. See ECF No. 105. Instead, Plaintiff largely rehashes his complaint, contending that Defendants' various actions were unconstitutional, and that Defendants are thus not entitled to summary judgment. See id. To Plaintiff's credit, he does contend that the allegations in his complaint are disputed, and occasionally directly disputes a fact that Defendant has argued is undisputed. See, e.g., id. at 2, 5, 17. Plaintiff cites and relies upon his complaint as supporting evidence. E.g., id. at 4, 8–9. He also cites to three medical requests that he filed, as well as a declaration and an affidavit that he included with his opposition. E.g., id. at 3, 7, 9. He also raises numerous new factual allegations that he did not raise in his complaint. See, e.g., id. at 17–19.

Plaintiff is entitled to oppose Defendant's motion, and the Court considers his opposition. The Court will also consider the documents attached to Plaintiff's opposition. But Plaintiff has not complied with Rule 260(b). The Court deems Plaintiff to have admitted those facts not disputed by his submissions. See, e.g., Fed. R. Civ. P. 56(e); Beard v. Banks, 548 U.S. 521, 527 (2006) ("[B]y failing specifically to challenge the facts identified in the defendant's statement of undisputed facts, [plaintiff] is deemed to have admitted the validity of the facts contained in the [defendant's] statement."); Brito v. Barr, No. 2:18-cv-00097-KJM-DB, 2020 WL 4003824, at *6 (E.D. Cal. July 15, 2020); see also Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004).

**F. Defendant's Evidence:**

Defendants contend that the following facts are undisputed. Given the numerosity and clinical nature of Defendants' alleged undisputed facts, the Court reproduces Defendant's table from the motion for summary judgment. Defendants refer to Plaintiff by his name.

Defendants' statement of undisputed facts is supported by several dozen exhibits, the declaration of Defendants' counsel and Plaintiff's attached deposition, as well as the declarations of Defendants Jackson and Wong and attached exhibits. See ECF No. 56-5 to 56-8.[4]

---

[4] The Court may refer to individual declarations and exhibits in support of its analysis. E.g., Wong Decl. ¶ 2; Wilson Decl., Ex. A, Henderson Dep.

| | **Undisputed Fact** | **Supporting Evidence** |
|---|---|---|
| 1. | Henderson had surgery to his right facial zygomatic bone in 2011 that resulted in chronic pain. | Henderson Dep. 16:8- 17:3, attached as Ex. A to Wilson Decl. |
| 2. | On December 5, 2014, Dr. Wong prescribed Elavil for the treatment of Henderson's chronic pain. | Wong Decl. ¶ 2; Gamez Decl. Exhibit A. |
| 3. | Elavil (amitriptyline) is an antidepressant medication that is also commonly prescribed for the treatment of chronic pain, such as of the type that Henderson was suffering from. A possible side-effect of Elavil is urinary retention. However, difficulty urinating is also a common result of many medical conditions, including infections. | Wong Decl. ¶ 3. |
| 4. | On January 18, 2015, Henderson was seen by a nurse and reported that he had had trouble urinating six days earlier and that he was now suffering from pain in his left testicle. | Wong Decl. ¶ 4; Gamez Decl. Exhibit B. |
| 5. | On January 20, 2015, Henderson was seen by Dr. Rudas with left-side scrotal pain and was transferred to San Joaquin General Hospital (SJGH) for further treatment. | Wong Decl. ¶ 4; Gamez Decl. Exhibit C. |
| 6. | At SJGH, Henderson was diagnosed with sepsis secondary to epididymitis. | Wong Decl. ¶ 4; Gamez Decl. Exhibit D. |
| 7. | Epididymitis is inflammation at the back of the testicle. It is most commonly caused by infections, such as urinary tract infections or sexually transmitted diseases. Sepsis is an inflammatory immune response triggered by an infection. Standard treatment for both epididymitis and sepsis is the use of antibiotics. | Wong Decl. ¶ 5. |
| 8. | At SJGH, Henderson informed staff that he believed his condition was the result of the use of Elavil. | Gamez Decl. Exhibit D. |
| 9. | Medical staff at SJGH did not diagnose the use of Elavil as the cause of the epididymitis and sepsis. | Gamez Decl. Exhibit D. |
| 10. | It is highly unlikely that the use of Elavil would cause an infection or lead to epididymitis or sepsis. | Wong Decl. ¶ 5. |
| 11. | Henderson was prescribed antibiotics for the sepsis and epididymitis and was discharged from SJGH. | Gamez Decl. Exhibit D. |
| 12. | Dr. Wong saw Henderson for examinations on January 30, February 13, and March 3, 2015. Because of persistent swelling to the left testicle, Henderson was referred to the urologist. | Wong Decl. ¶ 6 and Exhibits A, B, and C. |
| 13. | Henderson was seen by the urologist on March 5, 2015, who believed that the persistent epididymitis may be a result of chlamydia and recommended doxycycline. | Wong Decl. ¶ 7; Gamez Decl. Exhibits E & F. |
| 14. | Doxycycline is an antibiotic typically prescribed for treatment of chlamydia, a sexually transmitted disease. | Wong Decl. ¶ 7. |
| 15. | Dr. Wong prescribed doxycycline on March 5, 2015. | Wong Decl. ¶ 7 and Exhibit D. |
| 16. | Henderson was examined again by Dr. Wong on March 19, 2015, and it was noted that Henderson's epididymitis was resolving and that he would have another follow-up with the urologist. | Wong Decl. ¶ 8 and Exhibit E. |

| | | |
|---|---|---|
| 17. | Henderson had another follow-up with the urologist on March 26, 2015, and it was noted that the left testicle was still swollen and that various antibiotics had been unsuccessful in treating him. The urologist recommended an ultrasound and stated that a left orchiectomy may be necessary to remove the infected area. | Wong Decl. ¶ 9; Gamez Decl. Exhibit G. |
| 18. | An orchiectomy is the surgical removal of a testicle. | Wong Decl. ¶ 9. |
| 19. | Dr. Wong ordered an ultrasound on March 30, 2015. | Wong Decl. ¶ 9 and Exhibit F. |
| 20. | Dr. Wong examined Henderson on April 9, 2015, and prescribed Tylenol 3 for the relief of pain caused by the persistent epididymitis. | Wong Decl. ¶ 10 and Exhibit G. |
| 21. | The ultrasound took place on April 14, 2015. | Wong Decl. ¶ 11; Gamez Decl. Exhibit H. |
| 22. | Dr. Wong examined Henderson again on June 25, 2015, adjusted Henderson's pain medication, and noted that Henderson was scheduled for a follow-up with the urologist on August 6, 2015. | Wong Decl. ¶ 11 and Exhibit H. |
| 23. | The urologist recommended an orchiectomy. | Wong Decl. ¶ 12. Gamez Decl. Exhibit I. |
| 24. | Henderson was then seen by Dr. Pace on August 12, 2015, who completed a referral for an orchiectomy. | Gamez Decl. Exhibits I & J. |
| 25. | Henderson saw Dr. Wong on August 26, 2015. Henderson agreed to proceed with the orchiectomy and Dr. Wong ordered that his Tylenol 3 be continued for his chronic pain. | Wong Decl. ¶ 12 and Exhibit I. |
| 26. | Henderson underwent the orchiectomy on September 4, 2015, at SJGH. He was ordered by the doctor to keep his bandage in place for three days. | Wong Decl. ¶ 13 and Exhibt J; Gamez Decl. Exhibit K. |
| 27. | Henderson was seen by Dr. Rudas on September 8, 2015. The surgical site was described as "well healing" and there were no signs of infection. | Gamez Decl. Exhibit L. |
| 28. | Later on September 8, 2015, Henderson was examined by Dr. Wong. Henderson reported that his pain was controlled, and he denied any infection. The examination found no swelling or discharge at the surgical site. Dr. Wong ordered a follow-up with the surgeon, daily wound care, and the pain-reliever Tylenol #3 as needed. | Wong Decl. ¶ 13 and Exhibit J. |
| 29. | Early on September 9, 2015, Henderson returned to the medical clinic after reporting that his testicle was bleeding again. The physician on call was contacted and directed that Henderson be scheduled for a follow-up with a doctor later that day. | Gamez Decl. Exhibit M. |
| 30. | Henderson returned to the clinic later on September 9, 2015, was seen by a doctor, had his dressing changed, and was returned to custody in stable condition. | Gamez Decl. Exhibit N. |
| 31. | Dr. Rudas saw Henderson on September 11, 2015, and noted that the surgical site was healing well and that there was no infection. He ordered that Henderson could return to the clinic for a dressing change as needed. | Gamez Decl. Exhibit O. |

| | | |
|---|---|---|
| 32. | Henderson was then seen by a nurse on September 15, 2015, reported that he had been doing his own dressing changes, and was found to have three lesions with purulent drainage on his testicles. | Wong Decl. ¶ 14; Gamez Decl. Exhibit P. |
| 33. | Dr. Wong was contacted on September 15, 2015, and he ordered prescriptions for the antibiotics Septra (Bactrim) and Clindamycin. He also ordered that Henderson be seen for follow-ups by the nurses until his wound was healed. | Wong Decl. ¶ 14 and Exhibit K. |
| 34. | Henderson was seen by a nurse on September 16, 2015, for his dressing change. A yellowish drainage was noted along with swelling and tenderness. | Wong Decl. ¶ 15; Gamez Decl. Exhibit Q. |
| 35. | Dr. Wong was contacted on September 16, 2015, and he ordered that Henderson be sent to the prison's triage and treatment area for further evaluation. He also ordered that Henderson be given the antibiotic Rocephin. | Wong Decl. ¶ 15 and Exhibit L. |
| 36. | In the triage and treatment area, Henderson was seen by a family nurse practitioner, diagnosed with an infection, and it was ordered that he be transferred to SJGH. | Gamez Decl. Exhibit R. |
| 37. | At SJGH, Henderson was diagnosed with a post-operative infection and groin pain. He was discharged in stable condition. | Gamez Decl. Exhibit S. |
| 38. | Upon his return to the prison, it was ordered that Henderson have a follow-up in three to five days with his doctor. | Gamez Decl. Exhibit T. |
| 39. | The surgeon at SJGH recommended that Henderson remain on Septra. | Gamez Decl. Exhibit U. |
| 40. | Henderson was then seen by medical staff for dressing changes on September 18, 2015, September 20, 2015, September 21, 2015, and September 22, 2015. | Gamez Decl. Exhibit V. |
| 41. | On September 22, 2015, Henderson was seen by Dr. Wong. The infection was described as being more under control with no swelling or discharge. Dr. Wong reviewed the recommendations of the surgeon at the San Joaquin General Hospital and the plan was to continue all of Henderson's medications. | Wong Decl. ¶ 16 and Exhibit M. |
| 42. | Henderson was then seen again by medical staff for dressing changes on September 23, 2015, September 24, 2015, September 25, 2015, September 26, 2015, September 27, 2015, September 28, 2015, September 29, 2015, September 30, 2015, October 1, 2015, and October 2, 2015. | Gamez Decl. Exhibits W & X. |
| 43. | On October 2, 2015, it was noted by nursing staff that the wound at the surgical site was completely healed. Per Henderson's own request, he was provided with a seven-day supply of gauze and tape. He was also discharged from having dressing changes performed by medical staff. | Gamez Decl. Exhibit X. |
| 44. | On October 15, 2015, Henderson had another follow up with the surgeon at the San Joaquin General | Gamez Decl. Exhibit Y. |

| | | |
|---|---|---|
| | Hospital. It was noted that Henderson was now feeling better following the superficial infection and that there was no need for further antibiotics. | |
| 45. | On April 13, 2016, Henderson informed a nurse that he had been suffering from testicular pain since the previous morning. | Wong Decl. ¶ 17 and Exhibit N; Gamez Decl. Exhibit Z. |
| 46. | Dr. Wong diagnosed possible recurrent epididymitis and referred him to urology at SJGH. | Wong Decl. ¶ 17 and Exhibit N. |
| 47. | The urologist examined Henderson on April 21, 2016, diagnosed epididymitis, and recommended Cipro. | Wong Decl. ¶ 18; Gamez Decl. Exhibit AA. |
| 48. | A prescription for Cipro was ordered on April 21, 2016, by Dr. Rudas. | Wong Decl. ¶ 18; Gamez Decl. Exhibit AB. |
| 49. | Henderson was seen by Dr. Wong on April 27, 2016, and reported that the pain was much improved. He was diagnosed with epididymitis that was asymptomatic and resolving. Dr. Wong ordered that the Cipro be continued for three weeks and that Henderson have a follow up with the urologist as needed. | Wong Decl. ¶ 18 Exhibit O. |
| 50. | Dr. Wong next saw Henderson on July 5, 2016. Henderson denied any difficulty with urinating or any back pain and he refused to have his genitourinary system examined. | Wong Decl. ¶ 19 and Exhibit P. |
| 51. | On September 29, 2016, Henderson was seen by a nurse with complaints of pain from a new bump on his scrotum that had been getting progressively worse over the previous three days. Dr. Wong was contacted, and he ordered that Henderson be sent to the triage and treatment area for an incision and drainage by Dr. Rudas. Henderson was then seen by Dr. Rudas with complaints of a painful lump over his left scrotum that had been present for three days. Dr. Rudas diagnosed a skin abscess and performed an incision and drainage. He prescribed Bactrim and Clindamycin. | Wong Decl. ¶ 20 and Exhibit Q; Gamez Decl. Exhibits AC-AF. |
| 52. | Henderson alleges that after leaving the medical unit on February 19, 2015, he pulled his left groin area in such a way that it caused him extreme pain. He claims that Sergeant Ramirez and Officer Perez were present and ignored his requests for medical treatment. | First Amended Complaint, ECF No. 20, p. 6. |
| 53. | Licensed vocational nurse DeCoito was contacted on February 19, 2015, and told Sergeant Ramirez that nothing was wrong with Henderson. | First Amended Complaint, ECF No. 20, p. 6; Henderson Dep. 27:20-29:9, attached as Ex. A to Wilson Decl. |
| 54. | Henderson submitted a request for medical care on February 19, 2015, complaining of groin pain, and the request was reviewed by Nurse Toralba, who told Henderson that he was scheduled to be seen by a doctor in a couple days and that he should wait for that appointment. | Gamez Decl. Exhibit AG. |
| 55. | Henderson was seen by a Dr. Aikens on December 19, 2017, due to an elevated prostate-specific antigen (PSA) and urinary hesitancy. He was diagnosed with an elevated PSA that may have been associated with | Jackson Decl. ¶ 3; Gamez Decl. Exhibit AH. |

| | | |
|---|---|---|
| | a mild urinary tract infection. The urologist recommended another PSA test and a follow-up. He also diagnosed a weak urine stream that could be the result of benign prostatic hyperplasia (prostate enlargement) or decreased bladder contractility. He recommended a prescription for Flomax. | |
| 56. | Henderson was seen by Dr. Jackson on January 8, 2018. The examination found no abdominal pain, no nausea, no vomiting, no fever, no chills, no shortness of breath, and a normal blood pressure. Dr. Jackson reviewed the recommendations of the urologist and ordered a PSA test and prescribed Flomax (Tamsulosin). He also ordered a follow-up with the urologist. | Jackson Decl. ¶ 4 and Exhibit A. |
| 57. | Henderson wishes that Dr. Jackson had ordered a CT-Scan of his kidney and groin area, but this was not recommended by Dr. Aikens and was not medically warranted. | Jackson Decl. ¶ 4 and Exhibit A. |
| 58. | Henderson submitted an inmate grievance regarding the care by Dr. Jackson. Dr. Smith responded at the institutional level of review. He reviewed Henderson's health records, including the records from the consultation with the urologist, and found that Dr. Jackson had followed the recommendations of the urologist in treating Henderson. Dr. Smith therefore determined that Henderson's medical care had been appropriate. | Gamez Decl. Exhibit AI. |
| 59. | On January 16, 2018, Henderson was seen by medical staff with nausea, vomiting, fever, and chills that had been present for one day. He was diagnosed with symptoms of a gastrointestinal illness. | Gamez Decl. Exhibit AJ. |
| 60. | Dr. Krpan was contacted on January 16, 2018, and ordered that Henderson be transported to the SJGH for further evaluation. | Gamez Decl. Exhibit AK. |
| 61. | At SJGH, it was noted that Henderson had been suffering from flank pain for one day and he was diagnosed with sepsis secondary to pyelonephritis. | Gamez Decl. Exhibit AL. |
| 62. | Sepsis is an inflammatory immune response triggered by an infection. Common symptoms include fever, difficulty breathing, and low blood pressure. Standard treatment includes antibiotics. Pyelonephritis (kidney infection) is a type of urinary tract infection. Common symptoms include fever, back or groin pain, and frequent urination. Common treatment for both sepsis and pyelonephritis is antibiotics. | Jackson Decl. ¶ 6. |
| 63. | Henderson was placed on antibiotics. | Gamez Decl. Exhibit AL. |
| 64. | Henderson was discharged from SJGH on January 20, 2018, and was seen by Dr. Jackson on January 25, 2018. It was noted that Henderson's pyelonephritis was showing marked improvement and that the flank pain was resolving. | Jackson Decl. ¶ 9 and Exhibit B. |
| 65. | On February 5, 2018, Officer Moua was searching inmates as they exited the dining hall. Henderson held | Barba Decl. Exhibit A. |

12

| | | | |
|---|---|---|---|
| | | a position as a worker in the dining hall. Officer Moua found that Henderson had eight state burritos concealed in his laundry bag. Officer Moua charged Henderson with a rule violation for the misuse of food. Officer Moua also recommended that Henderson be removed from his job. | |
| | 66. | A hearing on the rule violation was conducted by Sergeant Ancheta, who reviewed the prison's institutional count to confirm that Henderson had been working in the dining hall on February 5, 2018. Sergeant Ancheta found Henderson guilty of the rule violation. | Barba Decl. Exhibit A. |
| | 67. | Thorpe was the instructor with the C-Facility Office Services and Related Technology (C-OSRT) program. Henderson submitted a request to be assigned to the C-OSRT class. Thorpe denied this request on February 6, 2018, because Henderson had been charged with a rule violation for stealing food and Thorpe did not want to reward this behavior with an assignment in C-OSRT. | Barba Decl. Exhibit B. |
| | 68. | Henderson submitted an inmate appeal regarding Thorpe's decision. His appeal was denied at the second level of review by Clevenger and Lizarraga. | Barba Decl. Exhibit C. |
| | 69. | Henderson spoke about Thorpe's decision with Captain Stacy, who did not take any action regarding either the rule violation or the decision by Thorpe to deny Henderson's request to be assigned to the C-OSRT class. | Henderson Dep. 89:7- 91:7, attached as Ex. A to Wilson Decl. |
| | 70. | Henderson alleges that Lizarraga, Stacy, Clevenger, Ancheta, and Moua failed to protect him by leaking confidential information to the general population inmates leading to his assault by other inmates. | First Amended Complaint, ECF No. 20, p. 24. |
| | 71. | Henderson states that an inmate told him to stop "snitching" and that two others called him a snitch before attempting to assault him. | Henderson Dep. 94:14- 23, attached as Ex. A to Wilson Decl. |
| | 72. | Henderson states that he had provided information to the institution that prevented the death of other people and that he turned drugs into the security squad. | Henderson Dep. 94:14- 23, attached as Ex. A to Wilson Decl. |
| | 73. | The confidential information provided by Henderson to staff was recorded in three chronos written by staff and Henderson states that the chronos were then leaked to the inmate population. | Henderson Dep. 95:2- 24, attached as Ex. A to Wilson Decl. |
| | 74. | Henderson claims that staff will "just drop" confidential documents on the prison yard or leave them out on tables in the dayroom to be found by inmates. | Henderson Dep. 92:4- 93:4, attached as Ex. A to Wilson Decl. |
| | 75. | Henderson does not know who supposedly leaked the chronos to the inmate population but claims that Lizarraga allowed them to be leaked. | Henderson Dep. 95:25- 96:3, attached as Ex. A to Wilson Decl. |
| | 76. | Henderson admits that Lizarraga never told him that he was going to leak the chronos. | Henderson Dep. 97:9- 12, attached as Ex. A to Wilson Decl. |

///

13

**G.  Plaintiff's Evidence on Opposition:**

Plaintiff's opposition is detailed but meandering and conclusory. He often does not cite documents for which he claims there is documentary evidence. <u>E.g.</u>, ECF No. 105 at 17. Plaintiff's evidence mostly consists of repeating his claims and arguing that they establish constitutional violations. The Court accordingly distills Plaintiff's claims and opposition down to specific factual allegations. The Court does not repeat underlying legal arguments.

**1.  Dr. Wong:**

Plaintiff contends that Dr. Wong knowingly did nothing to treat the swelling in Plaintiff's testicle. <u>Id.</u> 2. Dr. Wong prescribed Elavil for management of chronic pain,[5] but Dr. Wong knew it would cause side effects like dizziness and vomiting. <u>Id.</u> at 3. When Plaintiff told Dr. Wong about the swelling in Plaintiff's testicle, he only stated that the swelling would go down and sent Plaintiff away without further treatment. <u>Id.</u> at 3. Plaintiff cites to a printout of drug facts concerning Elavil to show Dr. Wong knew of the side effects it would cause Plaintiff. <u>Id.</u>

In addition to ultimately losing his left testicle, Plaintiff contends that he underwent a skin graft to repair his urethra on August 20, 2019. <u>Id.</u> at 4. Plaintiff apparently argues that the damage to his urethra was due to Dr. Wong's delay in treating his swollen testicle, which ultimately turned out to be epididymitis. <u>Id.</u> He cites his affidavit concerning allegations against Defendant Dr. Jackson as support. <u>See id.</u> Dr. Wong apparently did finally refer Plaintiff to Dr. Rudas, who stated that his epididymitis case was the worst he'd ever seen, and that any treatment would be ineffective without removal of his left testicle. <u>Id.</u> Plaintiff contends that Dr. Wong did nothing to treat Plaintiff's epididymitis for 30 days. <u>Id.</u> at 5.

**2.  Sergeant Ramirez and Officer Perez:**

Plaintiff's opposition restates his allegations that, when Plaintiff collapsed in pain, Perez merely mocked him and placed him in a holding cage. <u>Id.</u> at 6. Ramirez, Plaintiff repeats, told Plaintiff that nothing would be done for him and that Plaintiff would have to treat his infected testes himself. <u>Id.</u>

///

---

[5] Presumably, Plaintiff refers to the chronic pain from his facial surgery, not from his testicle. <u>See</u> ECF No. 20 at 5.

### 3.  Dr. Jackson:

Plaintiff ostensibly went to see Dr. Jackson around January 8, 2018. Id. at 8. Plaintiff explained that he was in extreme pain, had nausea, and had difficulty urinating. Id. Plaintiff contends that Dr. Jackson did not examine him, but just sat at his desk reading articles about Oprah Winfrey. Id. Plaintiff explained his medical history and the removal of his left testicle, and Dr. Jackson stated it was likely Plaintiff had sepsis. Id. Dr. Jackson declined to provide any treatment. Id. Dr. Jackson allegedly ignored written treatment requests from Plaintiff. Id. at 9. Because of the lack of treatment, Plaintiff contends that he awoke on January 16, 2018 to extreme kidney pain, vomited, and then blacked out. Id.

Plaintiff then asserts that, years prior, on May 31, 2011, Plaintiff fractured his clavicle. Id. at 10. Dr. Jackson allegedly ignored instructions to surgically address the fracture, and later failed to fix dislodged screws that had been used to repair Plaintiff's fracture.[6] Id. at 10–11.

Plaintiff goes on to discuss other Defendants and other non-party individuals, contending that as a result of their actions, he has been attacked by other inmates, suffered a stroke, and now uses a walker and wheelchair. Id. at 12. He contends that he has vision problems, has plates and screws in his face, is on a liquid diet because he cannot chew due to chronic pain, must wear adult diapers, and that he has erectile dysfunction. Id. at 12–13.

### 4.  Dr. Smith:

Dr. Christopher Smith is the chief physician at MCSP. Due to Plaintiff's alleged mistreatment and the alleged disregard of his medical conditions, Plaintiff asserts that he joined the Inmate Advisory Counsel (IAC) and chaired the medical subcommittee. Id. at 14. Plaintiff asserts that he informed prison officials, while serving on the IAC, of inmate plots to attack Dr. Wong. Id. at 15. A correctional officer beat an inmate involved in the plot against Dr. Wong, illustrating Defendant Lizarraga's custom of allowing staff to wantonly violate inmates' rights. Id. at 16.

Plaintiff's alleges that, during an IAC meeting, Dr. Smith was asked why psychiatric medication was prescribed for pain management. Id. Dr. Smith responded that most inmates' pain

---

[6] Plaintiff apparently includes Dr. Jackson's actions from 2011 because they establish other, relevant misconduct. See ECF No. 105 at 9–10.

1  is imagined, that prescribing psychiatric medication keeps inmates from making decisions they

2  would not otherwise make,[7] and that psychiatric medication was cost-effective. Id.

3        Dr. Smith also allegedly declined to order surgery on Plaintiff's face after other

4  inmates attacked Plaintiff in August 2018. Id.

5       **5.  Moua, Thorpe, Clevenger, Stacy, and Ancheta:**

6        Plaintiff repeats his allegation that documents confirm that Plaintiff was not at his

7  kitchen assignment on the day Moua alleged Plaintiff stole food. Id. at 17. He does not cite to the

8  record. See id. After Plaintiff filed a complaint, Ancheta "ratified" Moua's false statement. Id.

9  Ancheta told Plaintiff that he would make Plaintiff's life difficult if Plaintiff filed a complaint. Id.

10  Defendant Stacy allegedly knew of and failed to correct Moua's and Ancheta's actions, telling

11  Plaintiff that he did not care. Id.

12       **6.  Lizarraga:**

13        Plaintiff contends, for the first time on opposition, that Defendant Lizarraga forced

14  Plaintiff to deliver four televisions to other inmates. Id. Plaintiff tried to use one of the televisions

15  and, when it did not work, he took it apart and found drugs. Id. Plaintiff alleges Lizarraga used

16  Plaintiff to deliver drugs. Id. When Plaintiff did not deliver all the televisions, Lizarraga threatened

17  Plaintiff and had other inmates assault him on multiple occasions. Id. at 17–19.

18      **H.  Plaintiff's New Factual Allegations Raised on Opposition:**

19        To the extent that Plaintiff raises new grounds and new theories on opposition (e.g.,

20  Lizarraga's alleged drug scheme), the Court does not consider them. Summary judgment is not an

21  opportunity for Plaintiff to fill in gaps in his complaint. See Updike v. Multnomah County, 870

22  F.3d 939, 952 (2017); see also Trishan Air, Inc. v. Federal Ins. Co., 635 F.3d 422, 435 (9th Cir.

23  2011). A party's failure to meet its initial burden of raising all facts necessary to support the material

24  elements of its legal claims does not obligate the Court to permit a party to offer allegations outside

25  the pleadings. See, e.g., Wasco Prods., Inc. v. Southwall Tech., Inc., 435 F.3d 989, 992 (9th Cir.

26  2006) (citing Fleming v. Lind–Waldock & Co., 922 F.2d 20, 24 (1st Cir. 1990)).

27

28  [7] It is unclear if Plaintiff means to stay that Dr. Smith implied that psychiatric medication keeps inmates from making decisions they otherwise *would* make. See ECF No. 105 at 16.

1    Federal Rule of Civil Procedure 8's liberal notice pleading standard does not here

2    justify new factual allegations that do not fall within the original complaint. Rule 8(a)(2) requires

3    that the allegations in the complaint "give the defendant fair notice of what the plaintiff's claim is

4    and the grounds upon which it rests." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512, 122 S.Ct.

5    992, 152 L.Ed.2d 1 (2002) (quotation omitted).

6    The Court disregards any new factual allegations that Plaintiff raises on opposition

7    and that are not supported by the complaint. The Court declines to consider new issues as a motion

8    to amend. See, e.g., Pickern v. Pier 1 Imports (U.S.), Inc., 457 F.3d 963, 968–69 (9th Cir. 2006).

9    **III. STANDARD OF REVIEW**

10    Summary judgment is warranted when there is "no genuine dispute as to any

11    material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

12    Washington Mutual Inc. v. United States, 636 F.3d 1207, 1216 (9th Cir. 2011). A fact is material

13    if it might affect the outcome of the lawsuit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

14    (1986). In other words, an issue of material fact is genuine only if there is sufficient evidence for a

15    reasonable factfinder to find for the non-moving party. E.g. id. On motion for summary judgment,

16    the Court determines only whether there is a genuine issue for trial. Thomas v. Ponder, 611 F3d

17    1144, 1149–50 (9th Cir. 2010). In so doing, the Court must liberally construe a pro se prisoner

18    plaintiff's filings. Id. at 1150.

19    Federal Rule of Civil Procedure 56 permits courts to grant summary adjudication,

20    or partial summary judgment, when there is no genuine issue of material fact as to an entire claim

21    or a portion of a claim. See Fed. R. Civ. P. 56(a); Lies v. Farrell Lines, Inc., 641 F.2d 765, 769 n.3

22    (9th Cir. 1981); Smith v. Cal. Dep't of Highway Patrol, 75 F. Supp. 3d 1173, 1179 (N.D. Cal. 2014).

23    The standards that apply on a motion for summary judgment and a motion for summary

24    adjudication are the same. See Fed. R. Civ. P. 56 (a), (c); Mora v. Chem-Tronics, 16 F. Supp. 2d

25    1192, 1200 (S.D. Cal. 1998).

26    Summary judgment should be entered "after adequate time for discovery and upon

27    motion, against a party who fails to make a showing sufficient to establish the existence of an

28    element essential to that party's case, and on which that party will bear the burden of proof at trial."

17

1    Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the "initial

2    responsibility" of demonstrating the absence of a genuine issue of material fact. Id. at 323. A party

3    demonstrates that summary judgment is appropriate by "informing the district court of the basis of

4    its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories,

5    and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence

6    of a genuine issue of material fact." Id. at 323 (quoting Fed. R. Civ. P. 56(c)). On an issue for which

7    the nonmoving party will have the burden of proof at trial, the moving party need only point out

8    "an absence of evidence to support the nonmoving party's case." Id. at 325. A moving party may

9    also produce evidence negating an essential element of the nonmoving party's claim or defense.

10   E.g., Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

11          If the moving party meets its initial burden, the burden shifts to the opposing party

12   to present specific facts showing a genuine issue of a material fact. See Fed R. Civ. P. 56(e);

13   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). An opposing party,

14   however, "must do more than simply show that there is some metaphysical doubt as to the material

15   facts." Matsushita, 475 U.S. at 587. The "mere existence of some alleged factual dispute between

16   the parties will not defeat an otherwise properly supported motion for summary judgment; the

17   requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247–48. An

18   issue of fact is a genuine issue if it reasonably can be resolved the non-moving party's favor. Fresno

19   Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014).

20          In this regard, the opposing party must move beyond the pleadings through citations

21   to the record—such as citations to affidavits, depositions, and admissions—designate specific facts

22   establishing a genuine issue for trial. Celotex, 477 U.S. at 324. The opposing party must "show

23   more than the mere existence of a scintilla of evidence." Anderson, 477 U.S. at 252. A non-moving

24   party, however, is not required to establish a material issue of fact conclusively in its favor; it is

25   sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties'

26   differing versions of the truth at trial." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc.,

27   809 F.2d 626, 630 (9th Cir. 1987). Still, "failure of proof concerning an essential element of the

28   nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

1    The Court may consider other materials in the record not cited to by the parties, but

2 it is not required to do so. See Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist.,

3 237 F.3d 1026, 1031 (9th Cir. 2001); see also Simmons v. Navajo County, Ariz., 609 F.3d 1011,

4 1017 (9th Cir. 2010). The Court need not scour the record to establish an absence or presence of

5 factual disputes when the evidence is not adequately set forth in opposing papers. See, e.g., Carmen,

6 237 F.3d at 1031. The Court, furthermore, cannot engage in determinations of credibility or

7 weighing of evidence. Manley v. Rowley, 847 F.3d 705, 711 (9th Cir. 2017). Nevertheless, the

8 evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable

9 inferences" must be drawn in that party's favor. E.g., Anderson, 477 U.S. at 255; Fresno Motors,

10 771 F.3d at 1125. Summary judgment is inappropriate when divergent ultimate inferences may

11 reasonably be drawn from the undisputed facts. Fresno Motors, 771 F.3d at 1125.

12                                    **IV. DISCUSSION**

13    Defendants' motion for summary judgment centers on the contention that there is

14 no dispute as to any material fact, and thus all that remains is to determine whether Defendants

15 violated Plaintiff's constitutional rights. See generally ECF no. 56-2. Applying binding case law,

16 Defendants argue that none of Defendants' alleged actions were unconstitutional. Id. Thus, they

17 conclude, they are entitled to summary judgment. See id. at 23.

18    Defendants include, in their State of Undisputed Facts, a number of facts that

19 Plaintiff does not address in his complaint, opposition, or other submissions. The Court here

20 reiterates that because Plaintiff did not comply with Local Rule 260(b), it has deemed admitted any

21 unchallenged fact. Furthermore, the Court restates facts as necessary to avoid confusion.

22    **A. Plaintiff's Eighth Amendment Claims:**

23    To establish an Eighth Amendment claim based on prison medical treatment, an

24 inmate must show a deliberate indifference to a serious medical need. Jett v. Penner, 439 F.3d 1091,

25 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)); Hallett v. Morgan, 296

26 F.3d 732, 744 (9th Cir. 2002). A plaintiff must show (1) an objective "serious medical need" by

27 demonstrating that "failure to treat a prisoner's condition could result in further significant injury

28 or the 'unnecessary and wanton infliction of pain'" and (2) that a defendant's response to the serious

1  medical need was deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith,

2  974 F.2d 1050, 1059–60 (9th Cir. 1992)) (citation and internal quotations marks omitted), overruled

3  on other grounds by WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc); see

4  Colwell v. Bannister, 763 F.3d 1060, 1066 (9th Cir. 2014). Denial or delay of medical care may

5  constitute a constitutional violation. Estelle, 429 U.S. at 104–05.

6          Deliberate indifference exists if a defendant subjectively "knows of and disregards

7  an excessive risk to inmate health and safety." Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir.

8  2004) (emphasis added) (citation and internal quotation marks omitted). The question of deliberate

9  indifference focuses on what a defendant's mental attitude actually was. Farmer v. Brennan, 511

10 U.S. 825, 835–37 (1994). A prison official must have had a sufficiently culpable state of mind. Id.

11 at 834.  Deliberate indifference can be established by showing (a) a purposeful act or failure to

12 respond to a prisoner's pain or medical needs and (b) harm caused by the indifference." Jett, 439

13 F.3d at 1096 (citation omitted). Negligent medical care is not a constitutional violation. Frost v.

14 Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998) (citing Estelle, 429 U.S. at 105–06); see also Farmer,

15 511 U.S. 825, 835–37. "Medical malpractice does not become a constitutional violation merely

16 because the victim is a prisoner." Estelle, 429 U.S. at 106.

17         A difference of opinion between an inmate and prison medical staff about the proper

18 course of medical treatment is not deliberate indifference. See, e.g., Toguchi, 391 F.3d at 1058;

19 Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). Nor does a dispute between an inmate and

20 prison officials over the necessity or extent of medical treatment establish a constitutional violation.

21 See, e.g., Toguchi, 391 F.3d at 1058; Sanchez, 891 F.2d at 242. To establish that a difference of

22 opinion rose to the level of deliberate indifference, an inmate "must show that the course of

23 treatment the doctors chose was medically unacceptable under the circumstances." Toguchi, 391

24 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996). Inmates must show that a

25 medical provide chose a course of treatment in conscious disregard of an excessive risk to the

26 inmate's health. See Jackson, 90 F.3d at 332.

27 ///

28 ///

1          **1.  Dr. Wong:**

2                    Plaintiff does not dispute—or at least does not challenge—most of Defendants'

3          alleged facts concerning Dr. Wong.[8] To the extent that he disputes the causes of his medical

4          conditions and Dr. Wong's responsibility for them, at most he only creates some metaphysical

5          doubt as to the facts before the Court. Alternatively, Plaintiff asserts some legal interpretation of

6          the facts rather than showing there is a genuine issue for trial. See, e.g., ECF No. 20 at 5.

7                    **i.  Initial Prescription of Elavil:**

8                    Neither party disputes that Dr. Wong prescribed the antidepressant Elavil to treat

9          Plaintiff's surgery-related chronic pain. Plaintiff does not even challenge Defendants' contention

10         that Elavil is commonly prescribed for pain. See id.; ECF No. 105 at 3–4; UDF No. 1. Instead, he

11         argues that prescription of Elavil was unconstitutional because it is an antidepressant with possible

12         side effects and Dr. Wong did not inform Plaintiff of these facts or the resulting conditions (e.g.,

13         urinary difficulty). See ECF Nos. 20 at 5; 105 at 3–4. Plaintiff implies that, because of Elavil's

14         effects, he developed a bladder infection that led to the removal of his left testicle. See ECF Nos.

15         20 at 5; 105 at 3–4. Plaintiff cites to a copy of his medical treatment request and a leaflet of drug

16         facts to argue Dr. Wong knew ahead of time of Elavil's consequences to Plaintiff's health. ECF

17         No. 105 at 3.

18                   Defendants assert that any dispute over Dr. Wong's prescription of Elavil amounts

19         to a disagreement between Plaintiff and Dr. Wong about appropriate treatment. See ECF No. 56-2

20         at 16. Considering the undisputed facts, Defendants have met their initial burden of showing (1) an

21         absence of a dispute over a material fact that would alter the outcome of the case, and (2) that they

22         are entitled to summary judgment as a matter of law. See Celotex, 477 U.S. at 322–23. The burden

23         shifts to Plaintiff to show a genuine dispute over Dr. Wong's prescribing of Elavil. Matsushita, 475

24         U.S. at 586. Plaintiff, of course, is not required to *conclusively* establish a material issue of fact in

25         his favor. But Plaintiff's citation of his medical request and Elavil's drug facts at most creates doubt

26         as to Elavil's appropriateness or Dr. Wong's prior knowledge (and disregard) of Elavil's alleged

27         ─────────────────────
           [8] For ease of reference, when drawn from Defendants' Statement of Undisputed facts, the Court cites the number of

28         the undisputed fact (UDF). For example, if referring to Defendants' first fact from their Statement, the Court would
           cite it as UDF No. 1.

adverse effects. <u>See</u> ECF No. 105 at 3. He has not shown any factual dispute requiring a jury to resolve whether prescription of Elavil for chronic pain is uncommon[9] or that Dr. Wong knew that Elavil would cause adverse side effects in *Plaintiff specifically*.

The Court thus addresses whether Dr. Wong's preliminary prescription of Elavil was unconstitutional. The Court concludes that it was not.

Plaintiff disagrees with Dr. Wong's prescription of Elavil, claiming that prescription of psychiatric medication is inappropriate for pain management. <u>See</u> ECF Nos. 20 at 15; 105 at 3. A difference of opinion between a prisoner and medical provider about an appropriate course of treatment does not establish deliberate indifference giving rise to an Eighth Amendment claim. <u>See, e.g.</u>, <u>Toguchi</u>, 391 F.3d at 1058; <u>Sanchez</u>, 891 F.2d at 242. To prevail on a claim that a difference of opinion rose to deliberate indifference, Plaintiff must show that Dr. Wong's chosen course of treatment was medically unacceptable under the circumstances and that Dr. Wong chose the treatment in conscious disregard of an excessive risk to Plaintiff's health. <u>Toguchi</u>, 391 F.3d at 1058; <u>Jackson</u>, 90 F.3d at 332. On the record before the Court, there is no basis to conclude that Dr. Wong's initial prescription of Elavil was medically unacceptable under the circumstances. Nor has Plaintiff come forward with any evidence that Dr. Wong subjectively knew that Elavil posed an excessive risk to Plaintiff's health, and then disregarded that risk.

### ii. Elavil's Effect on Plaintiff and Dr. Wong's Subsequent Treatment:

Defendants assert as undisputed that it is unlikely that Elavil caused Plaintiff's epididymitis. UDF No. 10. Although Plaintiff told medical staff that Elavil caused the swelling in his testicle, medical staff disagreed. UDF Nos. 8–9. Plaintiff, the Court concludes, challenges Defendants' assertion.[10] ECF Nos. 20 at 5; 105 at 3–4. But other than conclusory statements, his medical requests, and the drug fact leaflet, Plaintiff does not submit any medical evidence indicating that Elavil caused his sepsis and epididymitis thereby leading to the eventual removal of his testicle. ECF Nos. 20 at 5–6; 105 at 3–4.

---

[9] Plaintiff's own submission of Elavil's drug facts indicates that it may be prescribed for purposes other than treatment of depression. <u>See</u> ECF No. 105 at 3.

[10] Plaintiff's opposition is not always direct in its response to Defendants' motion for summary judgment, but the Court infers from his submissions that Plaintiff maintains that Elavil caused his epididymitis and that Dr. Wong thereafter delayed treatment. ECF Nos. 20 at 5–6; 105 at 3–4.

22

Again, although Plaintiff does not need to conclusively establish that Elavil led to the conditions requiring removal of his testicle, he does nothing more than create some metaphysical, abstract doubt that Elavil did so. He does not adequately move beyond his pleadings to show that a dispute over Elavil's effects necessitates resolution at trial. Moreover, Plaintiff does not challenge Defendants' assertion that epididymitis is more commonly triggered by urinary tract infections or sexually transmitted diseases. ECF Nos. 20 at 5–6; 105 at 3–4; UDF Nos. 7–10. Nor does he dispute that a urologist later concluded that Plaintiff's enduring epididymitis might be the result of chlamydia, a sexually transmitted infection. ECF Nos. 20 at 5–6; 105 at 3–4; UDF No. 13.

Additionally, even if Elavil did cause Plaintiff's swollen testicle and related conditions, Dr. Wong responded appropriately and did not unconstitutionally delay treatment. Plaintiff asserts that, once his testicle swelled, Dr. Wong continued only to tell Plaintiff that the swelling would subside, and to prescribe Elavil for pain management. ECF Nos. 20 at 5–6; 105 at 3–4. Plaintiff alleges that Dr. Wong merely watched for 30 days as Plaintiff's testicle continued to swell. ECF No. 105 at 6.

Plaintiff does not dispute, however, that Dr. Wong examined Plaintiff on three occasions after Plaintiff's initial January 18, 2015, complaint of testicular pain: January 30, 2015; February 13, 2015; and March 3, 2015. ECF Nos. 20 at 5–6; 105 at 3–4; UDF No. 12. Dr. Wong referred Plaintiff to a urologist, an appointment which was pending over the course of Dr. Wong's three examinations of Plaintiff. Wong Decl. ¶ 6, Exs. A–C. Plaintiff saw the urologist on March 5, 2015. UDF No. 13. The urologist recommended doxycycline for Plaintiff's epididymitis. Id. Dr. Wong prescribed doxycycline on March 5, 2015. Id. UDF No. 15. Dr. Wong then saw Plaintiff on March 19, 2015, noted that Plaintiff's epididymitis was resolving, and noted Plaintiff would have a follow-up with the urologist. UDF No. 16. After the urologist noted continued swelling, Dr. Wong variously adjusted Plaintiff's pain medication, ordered an ultrasound, and recommended Plaintiff's testicle be removed (to which Plaintiff agreed). UDF Nos. 17–25.

Denial or delay of medical care may constitute deliberate indifference. Estelle, 429 U.S. at 104–05; Colwell, 763 F.3d at 1066; Jackson, 90 F.3d at 332. Once more, however, Plaintiff fails to put forward any evidence, other than his own allegations and request for treatment, that Dr.

23

1    Wong delayed Plaintiff's medical treatment. E.g., ECF Nos. 20 at 5–6; 105 at 3–4. Dr. Wong saw

2    Plaintiff on three occasions after Plaintiff complained of urinary difficulty and testicular pain. UDF

3    No. 12. Dr. Wong promptly referred Plaintiff to a urologist. See Wong Decl. ¶ 67, Ex. A.

4           Plaintiff, finally, also alleges Dr. Wong delayed and ignored Plaintiff's pain from

5    an abscess Plaintiff had developed on his scrotum around September 2016. ECF No. 20 at 8. But

6    Plaintiff does not challenge Defendants' asserted facts that a nurse examined Plaintiff on September

7    29, 2016, and informed Dr. Wong. UDF No. 51. Dr. Wong ordered Plaintiff be sent to the prison's

8    triage wing for drainage of the abscess. Id. Plaintiff does not forward any evidence indicated Dr.

9    Wong delayed medical care for the abscess. Dr. Wong was not deliberately indifferent.

10          The undersigned recommends that summary judgment be granted as to Dr. Wong.

11       **2.  Sergeant Ramirez and Officer Perez:**

12          Plaintiff asserts that the pain in his testicles became so severe that on February 19,

13   2015 he could not walk. ECF No. 20 at 6. Plaintiff went to the medical wing but Nurse DeCoito

14   took no action. Id. When he left the medical wing, Plaintiff pulled his groin and collapsed. Id. A

15   correctional officer activated an emergency alarm, but Nurse DeCoito told Sergeant Ramirez that

16   nothing was wrong with Plaintiff. Id. Sergeant Ramirez told Plaintiff that nothing would be done

17   for him. Id. Officer Perez allegedly just sat on the ground and mocked Plaintiff's pain. Id. The same

18   day, Plaintiff submitted a request for medical treatment. UDF No. 54. Nurse Toralba told Plaintiff

19   he had a doctor's appointment a couple days later and should wait for the appointment. Id. Perez

20   and Ramirez handcuffed Plaintiff and locked him in a holding cell. ECF Nos. 20 at 6; 105 at 17.

21          To the extent that Plaintiff alleges Ramirez and Perez denied him medical care, the

22   evidence indicates that it was Nurse DeCoito and Nurse Toralba who declined to treat Plaintiff or

23   who told him to wait for his next appointment. UDF No. 54; ECF No. 20 at 6. Plaintiff does not

24   dispute those facts. ECF Nos. 20 at 6; 105 at 6. Plaintiff has not established more than a scintilla of

25   evidence that Ramirez or Perez interfered with Plaintiff's medical care or denied it altogether.

26   Ramirez and Perez apparently relied on DeCoito's determination and, in any case, their actions

27   ostensibly occurred *after* Plaintiff had already been taken to the medical wing and after DeCoito

28   stated nothing was wrong with Plaintiff. See ECF Nos. 20 at 6; 105 at 6; Lemire v. California Dept.

24

of Corrections and Rehabilitation, 726 F.3d 1062, 1084 (9th Cir. 2013) ("[Defendants] did not act with deliberate indifference toward [the deceased prisoner because] they reasonably relied on the expertise of the prison's medical staff") (citing Johnson v. Doughty, 433 F.3d 1001, 1010–11 (7th Cir. 2006)); cf. Peralta v. Dillard, 744 F.3d 1076, 1086–87 (9th Cir. 2014).

The undersigned recommends that summary judgment be granted as to Plaintiff's claims against Sergeant Ramirez and Officer Perez.

**3. Dr. Jackson:**

Plaintiff claims that Dr. Jackson violated the Eighth Amendment in declining to order a CT scan and in allegedly ignoring requests for treatment. ECF Nos. 20 at 9; 105 at 8–10

Plaintiff met with a Dr. Aikens sometime after Plaintiff's surgery to remove his infected testicle, around December 19, 2017.[11] UDF No. 55; ECF Nos. 20 at 8–9; 105 at 8–10. Plaintiff met with Dr. Aikens due to elevated prostate-specific antigen (PSA) and urinary difficulty. UDF No. 55. Dr. Aikens diagnosed an elevated PSA possibly associated with a urinary tract infection. Id. Dr. Aikens recommended a follow-up and another PSA test. Id. He also diagnosed possible prostate enlargement or decreased bladder function. Id. Dr. Aikens recommended a Flomax prescription. Id. Plaintiff asserts that Dr. Aikens ordered a biopsy and ultrasound but provides no documentation or other citation to support the fact. ECF No. 20 at 9.

Dr. Jackson examined Plaintiff on January 8, 2018, after Plaintiff had visited Dr. Aikens. UDF No. 56. ECF Nos. 20 at 9; 105 at 8. Plaintiff contends that he told Dr. Jackson he had urinary difficulty and severe pain in his back and kidneys, but that Dr. Jackson did nothing except sit as his desk reading about Oprah Winfrey. ECF Nos. 20 at 9; 105 at 8. Dr. Jackson, Plaintiff alleges, declined to order a CT scan or transport Plaintiff to Dr. Aikens because doing so would be too expensive. ECF Nos. 20 at 9; 105 at 8. Plaintiff again provides no citation to support his claims. Nor does Plaintiff provide any evidence contradicting Defendants' assertion (and citation to Dr. Jackson's notes) that Dr. Jackson examined Plaintiff, reviewed Dr. Aikens' findings, ordered a new PSA test and Flomax prescription, and order a follow-up with Dr. Aikens. UDF No. 56; see ECF

---

[11] Plaintiff states that he saw Dr. Aikens on December 18, 2017, not December 19, 2017. ECF No. 20 at 8. The difference in dates is immaterial to Plaintiff's claims.

Nos. 20 at 8–9; 105 at 8–10. On the day Dr. Jackson examined Plaintiff, Plaintiff did not have abdominal pain, vomiting, fever, chills, shortness of breath, or abnormal blood pressure. UDF No. 56. Dr. Jackson's notes indicate that his examination of Plaintiff did not indicate nausea. See id. But Plaintiff contends that he told Dr. Jackson that he was nauseous. ECF No. 105 at 8.

Although Plaintiff contends that Dr. Aikens ordered a biopsy and ultrasound, Dr. Jackson determined, based on Dr. Aikens recommendations, that a CT scan was unwarranted. UDF No. 57. Dr. Aikens' notes, which Defendants submitted with their statement of undisputed facts, do not recommend a CT scan. Gamez Decl., Ex. AH. To Plaintiff's credit, Dr. Aiken did state a later biopsy could be warranted if Plaintiff's PSA remained elevated, but Dr. Aiken did not state one was necessary. Id.

Once more, although he cites to his affidavits, Plaintiff fails to forward any medical evidence that Dr. Jackson improperly or entirely denied care to Plaintiff. Furthermore, insofar as Plaintiff alleges Dr. Jackson did deny care or failed to provide adequate care (such as in failing to order a CT scan), Plaintiff has not established an Eight Amendment violation. Dr. Jackson's decision to order a new PSA test and Flomax prescription based on Dr. Aikens' recommendations, rather than order a CT scan is, at most, a difference of opinion between Plaintiff and Dr. Jackson. A difference of opinion between Plaintiff and Dr. Jackson about appropriate treatment for Plaintiff's pain and kidney-related issues does not establish deliberate indifference for an Eighth Amendment claim. See, e.g., Toguchi, 391 F.3d at 1058; Sanchez, 891 F.2d at 242. To show that a difference of opinion rose to deliberate indifference, Plaintiff must show that Dr. Jackson's chosen treatment was medically unacceptable under the circumstances and that Dr. Jackson chose the treatment in conscious disregard of an excessive risk to Plaintiff's health. Toguchi, 391 F.3d at 1058; Jackson, 90 F.3d at 332. On the record before the Court, there is no basis to conclude either.

Plaintiff also alleges that Dr. Jackson ignored Plaintiff's requests for treatment after Dr. Jackson examined Plaintiff on January 8, 2018. ECF Nos. 20 at 9; 105 at 9. Plaintiff submits two requests for treatment as evidence. ECF No. 105 at 21–22. Plaintiff requested treatment on January 10, 2018, and January 13, 2018. Id. He requested a CT scan from Dr. Jackson specifically on January 10, 2018, for worsening back pain. Id. at 21. He then generally requested emergency

1   treatment on January 13, 2018, for fever and chills and a feeling that his body was shutting down.

2   Id. at 22. No evidence before the Court states whether Dr. Jackson or any other prison official saw

3   or responded to the requests.

4         On January 16, 2018, Plaintiff woke to severe kidney pain, fever, chills, and

5   vomiting. Id. at 9; ECF No. 20 at 8–9. Plaintiff blacked out. ECF No. 20 at 10. Prison medical staff

6   noted that Plaintiff's symptoms had been present for one day. UDF No. 59; ECF Nos. 20 at 9–10;

7   105 at 9, 21–22. The prison's on call doctor sent Plaintiff to the hospital. UDF No. 59. Hospital

8   staff diagnosed Plaintiff with sepsis secondary to kidney infection. UDF 61–62. Hospital physicians

9   prescribed antibiotics. UDF 63. Dr. Jackson met with Plaintiff on January 25, 2018, and Plaintiff's

10   pain had improved. UDF No. 64.

11         Plaintiff has not established an Eighth Amendment violation. The Court does not

12   doubt that Plaintiff's progressive kidney issues constituted a serious medical need for the purposes

13   of the Eighth Amendment. See Jett, 439 F.3d at 1096. But Plaintiff has not shown that Dr. Jackson

14   was deliberately indifferent. See id.

15         As discussed earlier, deliberate indifference is a subjective question. Colwell, 763

16   F.3d at 1066; Toguchi, 391 F.3d at 1057. Dr. Jackson must have *known* of an excessive risk to

17   Plaintiff's health. Farmer, 511 U.S. at 837; Toguchi, 391 F.3d at 1057. Dr. Jackson must then have

18   disregarded that risk. Farmer, 511 U.S. at 837; Toguchi, 391 F.3d at 1057. Dr. Jackson, in other

19   words, must have been aware of facts from he could have drawn the inference that Plaintiff's health

20   would (or did) worsen by developing sepsis secondary to a kidney infection. See Toguchi, 391 F.3d

21   at 1057. He must then have drawn that inference. See id.

22         The Court concludes that Plaintiff's alleged facts at most create some abstract doubt

23   as to Dr. Jackson's knowledge of excessive risk. In fairness, Plaintiff did submit two requests for

24   medical treatment after Dr. Jackson examined Plaintiff on January 8, 2018. ECF No. 105 at 21–22.

25   But nothing indicates Dr. Jackson saw the requests or knew of them at all. No response from any

26   prison official is included with Plaintiff's opposition. See id. Moreover, to the extent that Plaintiff

27   alleges Dr. Jackson possessed sufficient facts to draw an inference, Plaintiff has not established that

28   Dr. Jackson was deliberately indifferent. For instance, when Dr. Jackson examined Plaintiff on

1    January 8, 2018, Plaintiff did not have abdominal pain, vomiting, fever, chills, shortness of breath,

2    or abnormal blood pressure. UDF No. 56. It was only later that Plaintiff complained of those

3    conditions. UDF No. 59–62; ECF Nos. 20 at 9; 105 at 21–22.

4            Even if Dr. Jackson *should* have been aware of a risk to Plaintiff's health—whether

5    from the January 8, 2018, meeting or as a result of Plaintiff's medical requests—inadvertent or

6    negligent failure to provide medical care does not trigger liability under § 1983. Jett, 439 F.3d at

7    1096. Even if Dr. Jackson committed malpractice in not diagnosing Plaintiff's serious conditions

8    or not timely responding to the grievances, without a showing of knowing disregard, Dr. Jackson

9    was not deliberately indifferent. Farmer, 511 U.S. at 837; Toguchi, 391 F.3d at 1057. Medical

10   malpractice is insufficient to illustrate a deprivation of constitutional dimensions. Toguchi, 391

11   F.3d at 1061.

12           The undersigned recommends granting summary judgment in favor of Defendants

13   on Plaintiff's claims against Dr. Jackson.

14       **4.  Dr. Smith:**

15           Dr. Smith is MCSP's chief physician. See, e.g., Gamez Decl., Ex. AI. Plaintiff

16   alleges that Dr. Smith adopted a policy of thrift that permitted MCSP physicians to forgo providing

17   inmates treatment in order to avoid expense. ECF No. 20 at 21. Plaintiff includes no record citations

18   to support his statement. He has not produced even a scintilla of evidence as support. The Court

19   recommends granting summary judgment as to that claim.

20           Plaintiff also contends that, during a meeting of the Inmate Advisory Counsel,

21   Plaintiff asked why MCSP physicians were prescribing psychiatric medication to treat pain. ECF

22   No. 105 at 16. Dr. Smith allegedly responded that most inmates' pain is imagined and interferes

23   with inmates' judgment, and that prescribing psychiatric medication was cost-effective. Id. Plaintiff

24   does not include any citations to support his claims and, in any event, does not explain how Dr.

25   Smith's actions violated the Eighth Amendment.[12] See id.

26   _____

     [12] Plaintiff does, however, repeat his contention that prescription of psychiatric medication to treat pain is
27   unconstitutional. To the extent Plaintiff even makes out a valid claim, the Court concludes that Plaintiff's disagreement
     again comes down to a difference of opinion with medical providers. A difference of opinion between an inmate and a
28   medical provider about appropriate treatment does not establish deliberate indifference giving rise to an Eighth
     Amendment claim. See, e.g., Toguchi, 391 F.3d at 1058; Sanchez, 891 F.2d at 242. Plaintiff has not raised any material

1       Dr. Smith also allegedly declined to order surgery on Plaintiff's face after other

2   inmates attacked Plaintiff. Id. Plaintiff did not raise this claim against Dr. Smith in his complaint,

3   and his opposition to Defendants' motion is not a chance for him to raise it now. The Court

4   disregards it.  See Updike, 870 F.3d at 952; see also Trishan Air, Inc., 635 F.3d at 435.

5       Plaintiff also challenges Dr. Smith's "ratification" of Dr. Jackson's allegedly

6   inadequate care. E.g., ECF No. 20 at 23. Plaintiff submitted a grievance concerning Dr. Jackson's

7   medical care. UDF No. 58. Dr. Smith responded at the institutional level. Id. Dr. Smith reviewed

8   Plaintiff's medical records, including the records from Plaintiff's visits to Dr. Aikens. Id. Dr. Smith

9   concluded that Dr. Jackson followed Dr. Aikens' recommendations and determined that Dr.

10  Jackson provided appropriate care. Id. Plaintiff contends Dr. Smith is liable under Monell.[13] Id.

11      To the extent Plaintiff seeks to impose liability on Dr. Smith only for denying his

12  grievance concerning Dr. Jackson's care, Plaintiff cannot do so. Prison officials' actions in

13  reviewing grievances are generally not a basis for § 1983 liability.[14] See, e.g., Ramirez v. Galaza,

14  334 F.3d 850, 860 (9th Cir. 2003); Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988); Shaheed v.

15  Cal. Corr. Health Care Servs., No. 13–cv–05751–VC, 2015 WL 3749623, at *5 (N.D. Cal. June

16  15, 2015). The denial of a grievance, standing alone, does not violate any constitutional right.

17  Shaheed, 2015 WL 3749623, at *5; see Estrada v. Cal. Corr. Inst., No. 1:18-cv-00599-SAB (PC),

18  2019 WL 568930, at *6 (E.D. Cal. Feb. 12, 2019).

19      To Plaintiff's credit, prison administrators cannot willfully turn a blind eye the

20  unconstitutional conduct of subordinates. See Jett, 439 F.3d at 1098 (stating that prison officials

21  are deliberately indifferent when they knowingly fail to respond to inmates' requests for help);

22

23  issue showing the prescription of psychiatric medication for pain management is medically unacceptable under the relevant circumstances. See, e.g., Toguchi, 391 F.3d at 1058.

24  [13] Monell provides that municipalities may be liable for constitutional violations under § 1983, including by ratifying an official's illegal conduct. See Monell, 436 U.S. at 658; Rodriguez v. County of Los Angeles, 891 F.3d at 776, 802–

25  03 (9th Cir. 2018). But Plaintiff more generally seeks to hold Dr. Smith (and others) personally liable. See ECF No. 20 at 21–23. The Court construes Plaintiff's Monell claims as actually alleging supervisory liability.

26  [14] See George v. Smith, 507 F.3d 605, 609 (7th Cir. 2007) ("Only persons who cause or participate in [constitutional] violations are responsible. Ruling against a prisoner on an administrative complaint does not cause or contribute to the

27  violation. A guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not."); Hunter v. Williams, No. 2:19-cv-

28  1101 CKD P, 2020 WL 2935427, at *5 (E.D. Cal. June 3, 2020); Arellano v. Sedighi, No.: 15-cv-02059-AJB-BGS, 2018 WL 1083386, at *8 (S.D. Cal. Feb. 27, 2018).

1    Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); Ford v. Lewis, No. 2:17-cv-0130-WBS-AC P,

2    2019 WL 2613426, at *3 (E.D. Cal. June 16, 2019). An individual who denies an inmate grievance

3    and who had authority and opportunity to prevent an ongoing constitutional violation could

4    potentially be subject to liability if the individual knew about an existing or impending violation

5    and failed to prevent it. See Jett, 439 F.3d at 1098; Ford, 2019 WL 2613426, at *3.

6         Nevertheless, there is no vicarious liability for civil rights violations. See Ashcroft

7    v. Iqbal, 556 U.S. 662, 677 (2009); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002). To state

8    a claim under § 1983, Plaintiff must demonstrate personal involvement in the underlying violation

9    of his rights. Ashcroft, 556 U.S. at 677; Jones, 297 F.3d at 934. Liability may not be based merely

10   on Plaintiff's dissatisfaction with the administrative process or a decision on an appeal. Ramirez,

11   334 F.3d at 860; Mann, 855 F.2d at 640. Nor is there supervisory liability under § 1983 unless a

12   supervisor (1) was personally involved in a constitutional deprivation, or (2) there is a sufficient

13   causal connection between the supervisor's wrongful conduct and the constitutional violation. E.g.,

14   Ashcroft, 556 U.S. at 676–77; Starr v. Baca, 652 F.3d 1202, 1206–07 (9th Cir. 2011); Rushdan v.

15   Gear, No. 1:16-cv-01017-BAM (PC), 2018 WL 2229259, at *3 (E.D. Cal. May 16, 2018).

16        Nothing indicates that Dr. Smith was involved in Plaintiff's care other than

17   reviewing Plaintiff's grievance of Dr. Jackson's treatment. As discussed, Dr. Jackson's care was

18   constitutionally sound. Plaintiff has not forwarded anything indicating that Dr. Smith was aware of

19   an ongoing constitutional violation that he was required to remedy. Dr. Smith is also not liable in

20   his supervisory capacity. The undersigned recommends granting judgment as to Dr. Smith.

21        **A. Plaintiff's Retaliation Claims:**

22        Prisoners retain First Amendment rights that are not inconsistent with incarceration

23   or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S.

24   817, 822 (1974). Prisoners retain important First Amendment rights in the ability to file grievances

25   and file civil actions in court. Rhodes v. Robinson, 408 F.3d 559, 567 (9th Cir. 2005). Without

26   those First Amendment protections, prisoners would be devoid of any effective vehicle to remedy

27   injustices attendant to their incarceration. See id. Purely retaliatory actions against a prisoner for

28   engaging in protected conduct undermine the First Amendment. Id. Prisoner claims of retaliation

1  for exercising First Amendment rights may support a claim under § 1983. Id.

2  A prisoner's basic First Amendment retaliation claim involves (1) an allegation that

3  a state actor took an adverse action against an inmate (2) because of (3) the inmate's protected

4  conduct, and that the action (4) chilled the inmate's exercise of First Amendment rights, and (5) the

5  action did not reasonably advance legitimate correctional goals. Id. at 567–68; Shepard v. Quillen,

6  840 F.3d 686, 688 (9th Cir. 2016). The adverse action must be such that it "would chill or silence

7  a person of ordinary firmness from future First Amendment activities." Watison, 668 F.3d at 1114.

8  Although prisoners are entitled to seek redress for retaliatory conduct of prison

9  officials, federal courts must be mindful that they were not established to supervise prisons, but to

10  enforce the constitutional rights of all persons, including prisoners. See, e.g., Cruz v. Beto, 405

11  U.S. 319, 321 (1982). Federal courts must afford prison administrators latitude in the administration

12  of prison affairs. Id. Prisoners may necessarily be subject to appropriate regulation. Id. The Court

13  must defer to the reasonable decisions of prison officials. Turner v. Safley, 482 U.S. 78, 84–85

14  (1987); Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985); Shepard, 840 F.3d at 688. Inmate

15  plaintiffs bear the burden of pleading and proving the absence of legitimate correctional goals. Pratt

16  v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995).

17  Nevertheless, prison officials may not negate a retaliation claim on summary

18  judgment simply by articulating a general justification for a neutral process, when there is a genuine

19  issue of material fact as to whether the action was taken in retaliation for the exercise of a

20  constitutional right. Bruce v. Ylst, 351 F.3d 1283, 1289 (9th Cir. 2003). If, in fact, defendant

21  officials used an otherwise legitimate correctional procedure or regulation as a ruse to punish or

22  silence an inmate, they cannot assert that use of the procedure or regulation served a valid

23  penological purpose. See id.; Shepard, 840 F.3d at 692. This is so even if the inmate ultimately and

24  otherwise deserved punishment. See Shepard, 840 F.3d at 692.

25  To survive summary judgment, an inmate must demonstrate a triable issue of

26  material fact on each element of a retaliation claim. Brodheim v. Cry, 584 F.3d 1262, 1269 n.3 (9th

27  Cir. 2009); see, e.g., Espinosa v. Dzurenda, No. 3:17-cv-00710-MMD-CBC, 2020 WL 6330049,

28  at *4 (D. Nev. June 11, 2020); Bardo v. Martel, No. CIV S–09–3479 GEB EFB P, 2012 WL

1  639442, at *3 (E.D. Cal. Feb. 27, 2012).

2          **1. Moua:**

3          Plaintiff has established a viable First Amendment retaliation claim against Moua.

4  Plaintiff satisfies each required element of a retaliation claim. Defendants only argue that Moua's

5  actions served a legitimate correctional goal in discouraging inmates from stealing from the prison.

6  See ECF No. 56-2 at 20.

7          First, Plaintiff alleges that Moua, a state correctional officer, charged him with a

8  rules violation, which meets the requirement of an adverse action. See Watison, 668 F.3d at 1114–

9  15; Brodheim v. Cry, 584 F.3d 1262, 1269–70 (9th Cir. 2009); Rhodes, 408 F.3d at 568; see also

10  Hines v. Gomez, 108 F.3d 265, 267–68 (9th Cir. 1997).

11          Second, causation is satisfied. Shepard, 840 F.3d at 688–89; Watison, 668 F.3d at

12  1114; Brodheim 584 F.3d at 1270–71. To succeed on a retaliation claim, Plaintiff must show that

13  his protected conduct was the substantial or motivating factor behind Moua's conduct. Brodheim

14  584 F.3d at 1271. To show the presence of causation on motion for summary judgment, however,

15  Plaintiff need only forward evidence of retaliatory motive that, viewed in the light most favorable

16  to him, presents a genuine issue of material fact as to Moua's intent in charging Plaintiff with a

17  rules violation.[15] Id. Plaintiff sufficiently alleges that Moua charged Plaintiff *because* he pursued

18  (or at least was going to pursue) a complaint against Moua, which is protected conduct. Shepard,

19  840 F.3d at 688–90; Watison, 668 F.3d at 1114; Brodheim 584 F.3d at 1269–71. Defendants do not

20  dispute, nor could they, that filing grievances for staff misconduct is protected under the First

21  Amendment. See, e.g., Watison, 668 F.3d at 1114.

22          Third, although Plaintiff does not explicitly allege that Moua's action chilled his

23  speech—for example, by dissuading him from filing a complaint—Plaintiff provides sufficient

---

[15] The Ninth Circuit has recognized that direct evidence of retaliatory motive is difficult to plead. Watison, 668 F.3d at 1114. Allegation of a chronology from which retaliation may be inferred is sufficient. Id. The Court may properly consider timing as circumstantial evidence of retaliatory intent. Pratt, 65 F.3d at 808. Here, then, Plaintiff's alleged timeline informs the Court's conclusion that Plaintiff has pled a viable retaliation claim. Plaintiff asserts that he threatened to file a complaint against Moua on February 4, 2018. ECF No. 20 at 11. Moua charged Plaintiff with a rules violation the very next day. UDF No. 65. A plaintiff may also raise a triable issue as to motive by offering direct or circumstantial evidence that a defendant expressed opposition to the Plaintiff's protected speech, or other evidence indicating that the defendant's reasons for an adverse action were pretextual. McCollum v. Cal. Dep't of Corr. and Rehab., 647 F.3d 870, 882 (9th Cir. 2011); Espinosa, 2020 WL 6330049, at *5.

1    evidence of chilling. The Ninth Circuit has explicitly held that an objective standard governs

2    chilling analysis. E.g., Brodheim, 584 F.3d at 1271. A plaintiff need not necessarily show that their

3    speech was *actually* inhibited. Id. Rather, it suffices to show that the alleged adverse action would

4    silence or deter a person of ordinary firmness from future protected speech. Id. A defendant cannot

5    escape liability just because a particularly determined inmate persists in their First Amendment

6    conduct. See id. The Court concludes that it cannot, as a matter of law, say that Plaintiff has failed

7    to placate this objective inquiry.[16] A rules violation charge, and all its attendant consequences, may

8    well silence an inmate of ordinary firmness from complaining of staff misconduct. See id.

9           Fourth and finally, Defendants' generic assertion of a legitimate correctional goal in

10   deterring inmate theft falls short. See Shepard, 840 F.3d at 692; Bruce, 351 F.3d at 1289.

11   Undoubtedly, maintenance of order and dissuading inmates from stealing are legitimate

12   correctional concerns. See Barnett v. Centoni, 31 F3d 813, 815–16 (9th Cir. 1994). But the Court

13   concludes that genuine issues of material fact remain as to whether Moua charged Plaintiff with a

14   rules violation in retaliation for Plaintiff's pursuit of a constitutionally protected right to complain

15   of mistreatment at the hands of prison staff. Summary judgment is thus inappropriate on Plaintiff's

16   retaliation claim. See Shepard, 840 F.3d at 692; Bruce, 351 F.3d at 1289. Indeed, Defendants may

17   argue in favor of a valid interest in deterring theft, but if Moua used MCSP's otherwise legitimate

18   rules violation procedures to silence Plaintiff, Defendants cannot now assert that the violation

19   procedure served valid penological ends. See Shepard, 840 F.3d at 692; Bruce, 351 F.3d at 1289.

20   As a matter of law, this remains the case even if Plaintiff did steal prison food and deserved

21   punishment. See Shepard, 840 F.3d at 692.

22          Genuine issues of fact remain as to Moua's motive in charging Plaintiff with a rule

23   violation and whether the charge advanced legitimate correctional goals. The undersigned

24   accordingly recommends that summary judgment be denied, and that Plaintiff's retaliation claim

25   _____

26   [16] Moreover, even a plaintiff who fails to allege that a prison official's adverse action had a chilling effect may still
     make out a retaliation claim if the plaintiff alleges that they suffered some other harm that is more than minimal. See,

27   e.g., Watison, 668 F.3d at 1114. Harm that is more than minimal will almost always have a chilling effect. E.g.,
     Brodheim, 584 F.3d at 1270; Rhodes, 408 F.3d at 567–68 n.11. The Court concludes Moua's rules violation charge
     and its ultimate consequences against Plaintiff establish harm that is more than minimal. See Brown v. Woodward, No.

28   1:19-cv-00626-DAD-SKO (PC), 2021 WL 694911, at *5–6 (E.D. Cal. Feb. 23, 2021).

against Moua be permitted to proceed.

### 2. Ancheta:

Plaintiff has also established a First Amendment retaliation claims against Ancheta. He again satisfies each required element of a retaliation claim. Defendants again only argue that Ancheta's actions served a legitimate correctional goal in discouraging inmates from stealing from the prison. See ECF No. 56-2 at 20.

If all Ancheta had done was uphold a finding that Plaintiff was guilty of a rules violation, without knowledge of or personal involvement in a constitutional violation, then he could not be liable under § 1983. See, e.g., Ashcroft, 556 U.S. at 677; Jones, 297 F.3d at 934. But Ancheta allegedly retaliated against Plaintiff because Plaintiff threatened to file a complaint against Ancheta for ignoring Plaintiff's evidence that he could not have committed theft. ECF No. 20 at 14. Ancheta told Plaintiff he would make Plaintiff's life unpleasant and then revoked Plaintiff's canteen privileges. Id. at 14, 19.

Ancheta's alleged imposition of a harsh punishment upon Plaintiff because Plaintiff threatened to file a complaint satisfies the requirement of an adverse action. See Watison, 668 F.3d at 1114–15; Brodheim, 584 F.3d at 1269–70; Rhodes, 408 F.3d at 568. Moreover, Ancheta allegedly threatened to make Plaintiff's life unpleasant. The threat of harm alone may constitute an adverse action. Brodheim, 584 F.3d at 1270.

Causation is also again satisfied. Shepard, 840 F.3d at 688–89; Watison, 668 F.3d at 1114; Brodheim, 584 F.3d at 1270–71. Viewed in the light most favorable to him, Plaintiff's allegations of Ancheta's retaliatory motive present a genuine issue of material fact regarding Ancheta's intent in punishing Plaintiff (to say nothing of threatening harm). Brodheim 584 F.3d at 1271. Plaintiff alleges that Ancheta threatened and punished Plaintiff *because* he threatened to file complaint against Ancheta. That allegation is sufficient. See, e.g., Shepard, 840 F.3d at 688–89; Watison, 668 F.3d at 1114; Brodheim 584 F.3d at 1270–71.

Although Plaintiff does not allege that Ancheta's threats and punishment deterred him from pursuing redress, Plaintiff has satisfied the objective question of chilling. See, e.g., Brodheim, 584 F.3d at 1271. Plaintiff does not need to show that his speech was definitively

34

1   inhibited. Id. The Court concludes that Ancheta's alleged threats and retaliatory punishment would

2   be enough to deter a prisoner of ordinary firmness from pursuing protected speech. See id. Ancheta

3   cannot outfox liability just because Plaintiff inmate persisted in his First Amendment conduct. Id.

4          Finally, Defendants' generic assertion of a legitimate correctional goal in deterring

5   inmate theft fails for Ancheta for the same reasons it failed for Moua. See Shepard, 840 F.3d at

6   692; Bruce, 351 F.3d at 1289. If Ancheta used MCPS's legitimate rules violation procedures to

7   avoid a complaint from Plaintiff, he cannot now assert that his perfidious conduct served legitimate

8   correctional goals.  See Shepard, 840 F.3d at 692; Bruce, 351 F.3d at 1289. As a matter of law, this

9   once more remains the case even if Plaintiff deserved punishment. See Shepard, 840 F.3d at 692.

10         Genuine issues of fact as to Ancheta motive in punishing Plaintiff for a rule violation

11  and whether the punishment advanced legitimate correctional goals.  The undersigned recommends

12  denying summary judgment as to Ancheta.

13         **3.   Thorpe:**

14         Plaintiff's retaliation claim against Defendant Thorpe is less cut-and-dry. The Court

15  concludes, nonetheless, for the purposes of summary judgment, that Plaintiff has established a

16  viable claim against her. After Moua charged Plaintiff with a rules violation, Plaintiff spoke to

17  Thorpe about a job transfer. ECF No. 20 at 12. Plaintiff told Thorpe that he was in the process of

18  filing a complaint against Moua. Id. In essence, Plaintiff then contends that Thorpe then denied

19  Plaintiff's job application because of his pursuit of a grievance against Moua. See id. Defendants

20  argue that Plaintiff's claim fails because Thorpe legitimately did not want to reward Plaintiff's theft

21  of prison food with a job transfer. ECF No, 56-2 at 20–21. The Court concludes that genuine issues

22  of material fact remain regarding Thorpe's motives and denial of Plaintiff's application.

23         The Court concludes that Thorpe's denial of Plaintiff's job application, allegedly in

24  retaliation for Plaintiff's protected conduct, is an adverse action. See Watison, 668 F.3d at 1114–

25  15; Brodheim, 584 F.3d at 1269–70; Rhodes, 408 F.3d at 568. Viewed in the light most favorable

26  to him, Plaintiff's allegations of Thorpe's retaliatory motive present a genuine issue of material fact

27  regarding Thorpe's intent in denying Plaintiff's job application; she allegedly denied Plaintiff's

28  application because he participated in the complaint process. See, e.g., Brodheim, 584 F.3d at 1271.

1    Although Plaintiff was not deterred from filing a complaint against Thorpe herself (see ECF No.

2    20 at 13), Plaintiff does not need to show that his participation in the complaint process against

3    Moua *or* Thorpe was suppressed. Brodheim 584 F.3d at 1271. Finally, Defendants' blanket

4    assertion that Thorpe did not want to reward theft fails. If Thorpe did deny Plaintiff's application

5    because Plaintiff complained of Moua's conduct, she cannot now assert that her rejection of his

6    application served valid correctional aims. See Shepard, 840 F.3d at 692; Bruce, 351 F.3d at 1289.

7            The undersigned recommends denying summary judgment in Plaintiff's favor.

8            **4.  Clevenger, Lizarraga, and Stacy:**[17]

9            Plaintiff does not establish claims against Clevenger, Lizarraga, or Stacy. He argues

10   that they are liable under Monell, which the Court has construed to mean Plaintiff argues that they

11   are liable in their supervisory capacities. Plaintiff argues that Clevenger, Stacy, and Lizarraga failed

12   to address Moua's, Ancheta's, and Thorpe's constitutional violations. See ECF No. 20 at 13–15,

13   21. Defendants argue that Plaintiff's claims against them fail because he has not established

14   underlying claims against Moua, Ancheta, or Thorpe. Defendants do not address the law of

15   supervisory liability, but the Court determines that their motion is sufficient to put the claim at

16   issue. The Court disagrees with Defendants' analysis, but nevertheless recommends granting

17   summary judgment because Plaintiff has not established a claim of supervisory liability.

18           A supervisor may be liable under section 1983 upon a showing of (1) personal

19   involvement in the constitutional deprivation or (2) a sufficient causal connection between the

20   supervisor's wrongful conduct and the constitutional violation. Henry A. v. Willden, 678 F.3d 991,

21   1003–04 (9th Cir. 2012). It is insufficient for a plaintiff only to allege that supervisors knew about

22   the constitutional violation and that they generally created policies and procedures that led to the

23   violation, without alleging a specific policy or event instigated by the supervisor that led to the

24   constitutional violations. Hydrick v. Hunter, 669 F.3d 937, 942 (9th Cir. 2012). A plaintiff must

25   also show that the supervisor had the requisite state of mind to establish liability, which turns on

26

27   [17] The undersigned has recommended granting summary judgment in favor of Dr. Smith on Plaintiff's claims that Dr. Smith is liable in his supervisory capacity for a policy of cost-cutting that led to Plaintiff losing his testicle. See supra section IV–A–4. The Court concludes that the supervisory liability analysis leading to its recommendation that summary judgment should be granted in favor of Clevenger, Lizarraga, and Stacy also applies to Dr. Smith.

28

the requirement of the particular claim—and, more specifically, on the state of mind required by the particular claim—not on a generally applicable concept of supervisory liability. <u>Oregon State University Student Alliance v. Ray</u>, 699 F.3d 1053, 1071 (9th Cir. 2012).

A supervisor may be liable in their personal capacity for their own culpable action or inaction in the supervision, training, or control of subordinates. <u>Willden</u>, 678 F.3d at 1003. A supervisor may also be liable for acquiescence to a constitutional violation or for conduct that indicates a reckless or callous disregard for the indifferences to the rights of others. <u>Id.</u> But a plaintiff may not simply recite the elements of a cause of action. <u>Id.</u> A Plaintiff must make sufficient allegations of underlying facts to give appropriate notice to the defendants. <u>Id.</u> Factual allegations must plausibly suggest entitlement to relief in order to avoid unfairness in requiring the defendants to be subjected to the vagaries of continued litigation. <u>Id.</u>

Plaintiff essentially alleges that Lizarraga, Clevenger, and Stacy are liable because they did not investigate or discipline Moua, Ancheta, or Thorpe for misconduct. <u>See</u> ECF No. 20 at 13–15, 21–23. He contends that Lizarraga, Clevenger, and Stacy had a custom and policy of encouraging staff misconduct. <u>Id.</u> at 21–23. Plaintiff states, without expansion, that the Defendants ignored guards' spraying of the kitchen with water, which led to E. coli exposure, and perpetuated a policy of allowing staff to make false reports. <u>Id.</u> at 21–22.

With respect to the retaliation claims for which the Court has recommended denying summary judgment, the Court determines that Plaintiff has not sufficiently demonstrated a genuine issue of material fact regarding Lizarraga's, Clevenger's, or Stacy's personal involvement in any underlying alleged constitutional deprivation. Plaintiff does not set forth any evidence to support a theory of a causal connection between those Defendants' specific conduct and the constitutional violations he alleges. And Plaintiff does not provide any non-conclusory evidence that those Defendants created a specific policy or procedure that permitted any retaliation.[18] <u>See</u> <u>Hydrick</u>, 669 F.3d at 942; <u>see also</u> <u>Quiroz v. Horel</u>, 85 F. Supp. 3d 1115, 1149–50 (N.D. Cal. 2015).

---

[18] Plaintiff does assert in his affidavit, however, that Lizarraga's employment as warden was terminated for corruption, which included allowing staff members to falsify reports. Even if this is so, Plaintiff still has not sufficiently demonstrated a genuine issue of material fact over whether Lizarraga was personally involved in any underlying constitutional violation that Moua, Ancheta, or Thorpe committed.

1         Additionally, there is an absence of evidence as to Clevenger, Lizarraga, or Stacy's

2    liability for the other claims against them (e.g., turning a blind eye to guards spraying down the

3    kitchen). Plaintiff has provided nothing more than conclusory generalizations that Clevenger,

4    Lizarraga, or Stacy were personally involved or had a sufficient causal relationship to Plaintiff's

5    claimed violations. See, e.g., ECF No. 20 at 21 ("Defendants [Clevenger, Lizarraga, and Stacy] are

6    directly responsible for not only deliberate indifference through failure to investigate and discipline

7    employees in the face of widespread constitutional violations [but] also having a custom of

8    encouraging [their] employees to use false rules and reports with impunity [as] punishment.")

9         Plaintiff makes blankets assertion that Clevenger, Lizarraga, and Stacy had authority

10   over and ignored the actions the of the specific individual defendants (e.g., Moua, Ancheta, and

11   Thorpe) who allegedly violated Plaintiff's constitutional rights. These allegations are conclusory

12   and not supported by sufficient factual content that would allow them to meet the pleading standard

13   articulated in Iqbal. Compare Starr, 652 F.3d at 1216–17 (reversing dismissal of claim against

14   supervisor defendant sued in his official capacity for an attack against an inmate involving prison

15   deputies, where plaintiff made detailed factual allegations above and beyond reciting the elements

16   of a deliberate indifference claim) with Hydrick v. Hunter, 669 F.3d at 941–42 (dismissing § 1983

17   claim against supervisors in their individual capacities where, instead of the detailed factual

18   allegations, Plaintiff asserted only conclusory allegations and generalities, without any allegation

19   of the specific wrongdoing by each supervisory defendant).

20        The undersigned recommends granting summary judgment in Defendants' favor on

21   Plaintiff's claims of supervisory liability against Lizarraga, Clevenger, and Stacy.

22   **B.  Plaintiff's Failure to Protect Claims:**

23       **1.  Legal Standard:**

24        The Eighth Amendment protects prisoners from inhumane methods of punishment

25   and from inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th

26   Cir. 2006). Prison conditions may be restrictive, but prison officials must provide prisoners with

27   food, clothing, shelter, sanitation, medical care, and personal safety. Farmer, 511 U.S. at 832–33.

28   ///

Prison officials have a duty to take reasonable steps to protect inmates from physical abuse. Id. at 833; Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005). The failure of prison officials to protect inmates from attacks by other inmates may rise to the level of an Eighth Amendment violation if prison officials know of and disregard a substantial risk of serious harm to the plaintiff. E.g., Farmer, 511 U.S. at 847; Hearns, 413 F.3d at 1040. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, [and] a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842.

To establish a violation of this duty, the prisoner must establish that prison officials were "deliberately indifferent to a serious threat to the inmate's safety." Id. 834. The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently "substantial risk of serious harm" to his or her future health. Id. at 843 (citing Helling v. McKinney, 509 U.S. 25, 35 (1993)).

As touched upon earlier, "deliberate indifference entails something more than mere negligence...[but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result." Farmer, 511 U.S. at 835. The Court defined this "deliberate indifference" standard as equal to "recklessness," in which "a person disregards a risk of harm of which he is aware." Id. at 836-37. The deliberate indifference standard involves both an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious." Id. at 834. Second, subjectively, the prison official must "know of and disregard an excessive risk to inmate health or safety." Id. at 837; Anderson v. County of Kern, 45 F.3d 1310, 1313 (9th Cir. 1995). To prove knowledge of the risk, however, the prisoner may rely on circumstantial evidence; in fact, the very obviousness of the risk may be sufficient to establish knowledge. Farmer, 511 U.S. at 842; Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995).

The Ninth Circuit has specifically recognized a valid cause of action where correctional officers label inmates as snitches, subjecting them to violence from other inmates. See Valandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989).

1        **2.  Lizarraga, Stacy, Clevenger, Ancheta, and Moua:**

2        Plaintiff alleges that Lizarraga, Stacy, Clevenger, Ancheta, and Moua failed to

3   protect him from violence at the hands of other inmates. ECF No. 20 at 24–28. He specifically

4   asserts that the Defendants leaked confidential information to the general prison, leading inmates

5   to repeatedly assault him. See id. Plaintiff asserts that, after he filed this action, Defendants told

6   other inmates that Plaintiff was a snitch and leaked confidential documents. Id. at 24. Fellow

7   inmates consequently called Plaintiff a snitch and beat him. Id. at 24–27. The documents ostensibly

8   concerned information Plaintiff had shared with prison administrators that prevented the death of

9   others and stated that Plaintiff had turned drugs over to staff. UDF No. 72.

10       Defendants move for summary judgment on grounds that Plaintiff makes only

11  conclusory allegations. Defendants rely on their statement of undisputed facts, which is here

12  informed by Plaintiff's deposition and which Plaintiff largely does not challenge. They specifically

13  argue that Plaintiff cannot point to which of the Defendants specifically leaked confidential

14  information or when. UDF Nos. 75–77. Nor does Plaintiff provide evidence that Lizarraga,

15  Clevenger, Stacy, Moua, or Ancheta knew of the inmate assaults. Plaintiff claimed to know

16  Lizarraga allowed the leaking of confidential information but admits in his deposition that

17  Lizarraga never told him that he allowed confidential information to be leaked. UDF No. 76.

18  Plaintiff's only explanation during his deposition was that he was at one time "in the loop" of

19  inmates would who receive information from and commit violence at the behest of correctional

20  officers. See UDF No. 78.

21       Considering the undisputed facts and Plaintiff's submissions, the Court concludes

22  that Defendants have carried their burden on summary judgment. Defendants have pointed out the

23  absence of evidence to support Plaintiff's claims against Clevenger, Stacy, Lizarraga, Ancheta, and

24  Moa. Plaintiff fails to challenge most of Defendants undisputed facts, let alone cite evidence as

25  required when opposing summary judgment.[19] E.g., Celotex, 477 U.S. at 324. Without moving

---

[19] Plaintiff does inferentially deny some of Defendants' alleged undisputed facts but does not include adequate citation to anything supporting his denial. Most notably, he contends that video evidence shows other inmates assaulting him. ECF No. 105 at 21. He contends, without citation, that Lizarraga allowed the inmates to assault him. Id. Plaintiff contends that Defendants defied a court order directing Defendants to produce the video evidence, but the Court's review of the record indicates Defendants produced the video. ECF No. 64 at 11. Plaintiff also sweepingly and without

1   beyond his pleadings, Plaintiff has failed to designate specific facts raising any genuine issue as to

2   Defendants' knowledge of a serious risk to Plaintiff's safety. Whether a defendant had the requisite

3   knowledge to be liable for failure to protect is a question of fact subject to typical evidentiary

4   demonstration. Farmer, 511 U.S. at 842. Plaintiff has not shown that Defendants knew anything,

5   let alone that they *purposely* leaked information so that other inmates would assault Plaintiff.

6          As stated, Plaintiff is not required to conclusively establish material facts in his

7   favor. T.W. Elec. Serv., Inc., 809 F.2d at 630. That is not the purpose of summary judgment. But

8   Plaintiff must show more than a scintilla of evidence. Anderson, 477 U.S. at 252. Plaintiff has not

9   done so. Plaintiff only makes conclusory allegations of Defendants' knowledge and disregard of

10  risk to his safety. E.g., ECF No. 20 at 24–26. For example, he broadly concludes that Defendants

11  failed to protect him from violence and that "[their] failure constitutes deliberate indifference and

12  is a violation of the constitution because the defendants leaking confidential information to the

13  general population set in motion a chain of events they knew would cause other prisoners to

14  violently assault [Plaintiff.]" Id. Plaintiff lists several alleged instances of inmates assaulting him,

15  but does not expand into specifics as to how Defendants are responsible. Id. Such conclusory

16  allegations are insufficient to defeat summary judgment. Soremekun v. Thrifty Payless, Inc., 509

17  F.3d 978, 984 (9th Cir.2007); Taylor, 880 F.2d at 1045.

18         Once again, then, through his conclusory and unsupported allegations, Plaintiff has

19  at most established some metaphysical doubt as to the material facts of his failure to protect claim

20  (i.e., doubt about Defendants' knowledge of a serious risk to Plaintiff's safety), which is insufficient

21  to survive summary judgment. See, e.g., In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387

22  (9th Cir. 2010). In fact, Plaintiff must forward evidence from which a jury could reasonably render

23  a verdict in the non-moving party's favor. Anderson, 477 U.S. at 252, 106 S.Ct. 2505. Even drawing

24  all reasonable inferences in Plaintiff's favor, the Court concludes that Plaintiff has not done so.

25         Consequently, Plaintiff's failure to protect claims fail on summary judgment.

26  Plaintiff has not established, as required, that Lizarraga, Clevenger, Stacy, Moua or Ancheta

27

28  specific claims Lizarraga regularly allowed inmate assault, indicating a pattern of conduct for which he may be held
    liable. ECF No. 105 at 21.

1   *subjectively* knew of and disregarded a substantial risk of serious harm to Plaintiff. E.g., <u>Farmer</u>,

2   511 U.S. at 835, 847; <u>Hearns</u>, 413 F.3d at 1040. And while Plaintiff need not actually show that

3   Defendants acted for the purpose of causing harm in order to establish an Eighth Amendment claim,

4   it is worth noting that neither has he shown that Defendants purposely instigated inmate assaults.

5         The undersigned thus recommends granting summary judgment in favor of

6   Lizarraga, Clevenger, Stacy, Moua, and Ancheta on Plaintiff's failure to protect claims.

7   **V. CONCLUSION[20]**

8         Based on the foregoing, the undersigned United States Magistrate Judge

9   recommends that Defendant's motion for summary judgment (ECF No. 56) be **GRANTED** in part

10  and **DENIED** in part. The undersigned recommends that Defendants' motion be **DENIED** as to

11  Plaintiff's First Amendment retaliation claims against Moua, Ancheta, and Thorpe. And the

12  undersigned recommends that the motion be **GRANTED** as to all of Plaintiff's other claims.

13        These findings and recommendations are submitted to the United States District

14  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after

15  being served with these findings and recommendations, any party may file written objections with

16  the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure

17  to file objections within the specified time may waive the right to appeal. See <u>Martinez v. Ylst</u>, 951

18  F.2d 1153 (9th Cir. 1991).

19

20  Dated:  March 5, 2021

21  _____

22      DENNIS M. COTA
    UNITED STATES MAGISTRATE JUDGE

23

24

25

26  [20] As the Court noted in explaining Plaintiff's allegations, Plaintiff variously raises claims that Defendants violated
California state law. For example, Plaintiff claims that Defendants violated California Government Code section 845.6

27  and California Civil Code section 52.1. <u>E.g.</u>, ECF No. 20 at 5, 7. To the extent that Plaintiff raises state law claims in
the operative complaint, Defendants have *not* addressed them in their motion for summary judgment. <u>See</u> ECF No. 56-

28  2. The undersigned accordingly makes no recommendation as to those claims.